[L.A. No. 30775. Aug. 25, 1978.]

WILLIAM NEAL, as Administrator, etc., Plaintiff and Appellant, v.
FARMERS INSURANCE EXCHANGE, Defendant and Appellant.

914

[redacted]

## COUNSEL

Gage & Cooper, Sanford M. Gage, Aitken, Bradshaw & Andres, Wylie A. Aitken and Leonard Sacks for Plaintiff and Appellant.

William Camusi, Stephen L. Odgers, Samuel Shore, Richard C. Mallery and William B. Boone as Amici Curiae on behalf of Plaintiff and Appellant.

Hagenbaugh & Murphy, Irwin Waldman and Brand L. Cooper for Defendant and Appellant.

Ellis J. Horvitz, Marc J. Poster, James J. Duryea and Timothy J. Hogan as Amici Curiae on behalf of Defendant and Appellant.

## OPINION

**MANUEL, J.**—In November of 1973, Mrs. Frances Neal, now deceased, filed this action seeking compensatory and punitive damages for the "bad faith" failure of Farmers Insurance Exchange (Farmers) to pay uninsured motorist benefits to her in accordance with a policy of automobile insurance under the terms of which she was a named insured. Mrs. Neal died during the pendency of the action and the complaint was amended to substitute her husband William Neal, administrator of her estate, as plaintiff. Following trial the jury returned an undifferentiated verdict in favor of plaintiff and against Farmers in the amount of $1,548,211.35. Farmers moved for a new trial, and the trial court entered an order that

the motion was granted on the issue of damages only unless plaintiff agreed to a reduction of the verdict to the amount of $749,011.48, in which case the motion was denied. Plaintiff filed a consent to the reduction and judgment was entered accordingly. Farmers appeals from the judgment. Plaintiff has filed a cross-appeal.[1]

On July 13, 1970, Mrs. Neal, while riding as a passenger in an automobile owned by her and her husband William Neal, and operated by the latter, was gravely injured in an intersection accident when their vehicle, while in the process of making a left turn, was struck broadside by a vehicle driven by an uninsured motorist. She spent the following 69 days in the hospital, her condition gradually changing from total paralysis from the neck down (due to fractured neck vertebrae and a damaged spinal cord) to total disability involving serious sensory and motor defects. She remained in the latter condition until her death from cancer early in 1974, or slightly more than a year prior to the trial of the instant action.

At the time of the automobile accident there was in force a policy of automobile insurance issued by Farmers which included a medical payment provision with limits of $5,000 and an uninsured motorist provision with limits of $15,000. A few days after the accident Mr. Neal contacted an attorney, Paul Gergen, a family friend, who undertook to communicate with Farmers in the hope of obtaining early payment under the policy. Some three months later payment of $5,000 was made pursuant to the medical payment coverage. Farmers, however, declined to pay the policy limit of $15,000 under the uninsured motorist coverage, ultimately taking the threefold position (1) that it was entitled, under an express policy provision, to offset the amount paid under the medical payment coverage against any amount due under the uninsured motorist coverage; (2) that the accident resulted *solely* from the negligence of Mr. Neal, thus precluding liability on the part of the uninsured motorist; and (3) that contributory negligence on the part of Mr. Neal might be legally imputed to Mrs. Neal.

In January of 1971, Mr. Gergen wrote to Farmers urgently requesting a prompt settlement. In this letter he disclosed that the Neals' son had contracted cancer, that major surgery had taken place, and that heavy medical expenses on this account were imminent. In view of this development he requested that if full payment under the uninsured

[1]The cross-appeal is proper. (See *Miller* v. *National American Life Ins. Co.* (1976) 54 Cal.App.3d 331, 341-345 [126 Cal.Rptr. 731].)

motorist coverage was not to be forthcoming, then Farmers should accept his alternate proposal that payment of $10,000 be made immediately, reserving the question of the $5,000 offset for future decision by an appropriate tribunal. Four days later Farmers responded to this letter by a telephone call from one of its employees advising Mr. Gergen that Farmers would seek the legal opinion of its attorney. It was not until April 21, almost three months later, that Farmers' attorney reported his conclusions (1) that the law was unclear on the matter of offset, (2) that any negligence on the part of Mr. Neal could not be imputed to Mrs. Neal, and (3) that "at best" the case was "50-50" on liability.

Having received the foregoing attorney's opinion, Farmers then offered to settle the case by payment of an additional $5,000. Mr. Gergen rejected this offer in a letter dated May 1, 1971, in which he set forth at length the evidence indicating negligence on the part of the uninsured motorist[2] and repeated the offer of settlement previously made by him. When Farmers did not respond to this letter within 10 days, he again wrote, this time withdrawing all previous offers of settlement and stating that if full payment of $15,000 were not received in his office within 10 days he would "institute arbitration proceedings requesting what I consider to be realistic damages in the sum of $500,000." Farmers did not respond to this letter.

The case was thereupon turned over by Mr. Gergen to Mr. Aitken, one of plaintiff's present attorneys. A demand for arbitration was made in August 1971, but due to unavailability of the arbitrator agreed upon, the hearing was not set until April of the following year. A continuance was granted at Mr. Aitken's request, and the next available date was February 16, 1973. The proceedings commenced on the latter date and in April of the same year the arbitrator rendered his decision in favor of Mrs. Neal

---

[2]Among other things the letter adverted to certain matters appearing in the police report which bore upon the speed of the car driven by the uninsured motorist. It was pointed out that skid marks on the scene and the position of the respective vehicles after the accident indicated (1) that the car driven by the uninsured motorist, an Oldsmobile sedan, entered into a 4-wheel locked slide 51 feet prior to impact; (2) that upon impact the Neal vehicle, a Dodge sedan, was knocked 9 feet in a sideways skid and 17 additional feet in a 4-wheel locked slide; (3) that the uninsured motorist's vehicle travelled an additional 21 feet forward following impact. At the subsequent arbitration hearing a consulting engineer testified that in his opinion, given these and other physical factors present, the uninsured motorist's vehicle was travelling some 57 miles per hour when the brakes were first applied. Opinion evidence presented at trial by nontechnical witnesses (attorneys experienced in casualty claims and litigation) indicated a similar view based on the same factors. The accident occurred during the noon hour at a commercial intersection. The posted speed limit was 45 miles per hour.

on the issue of liability, reserving his decision on the question of offset. At Mr. Aitken's request Farmers then paid the first $10,000, and six months later, when the arbitrator issued his decision on the offset question in favor of Mrs. Neal, the final $5,000 was paid.

The instant action, seeking compensatory and punitive damages for Farmers' "bad faith" refusal to enter into a prompt settlement, was filed on November 8, 1973. At trial plaintiff proved compensatory damages in the amount of $9,573.65—comprising $3,588.50 in costs and finance charges on a second deed of trust loan on the Neals' residence and $5,985.15 in legal fees and other costs incurred in the arbitration proceeding.[3] It was also shown that as of December 31, 1974, defendant Farmers had gross assets of some $765 million, net assets of approximately $211 million, and a 1974 net income of nearly $45 million. As indicated above, the jury returned a verdict, with no differentiation between compensatory and punitive damages, in the amount of $1,528,211.35, which was subsequently reduced to the amount of $749,011.48 by plaintiff's remittitur in response to the granting of a conditional order granting a new trial on the ground of excessive damages. (Code Civ. Proc., § 662.5, subd. (b).)

## FARMERS' APPEAL

In *Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566 [108 Cal.Rptr. 480, 510 P.2d 1032], we made it clear that the duty of an insurer to accept reasonable settlements of third party claims *against* its insured (see *Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425 [58 Cal.Rptr. 13, 426 P.2d 173]; *Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654 [328 P.2d 198, 68 A.L.R.2d 883]), is but one aspect of its obligation, imposed by law, to act fairly and in good faith in discharging its contractual responsibilities to its insured. Another aspect of that obligation, we pointed out, is the duty of the insurer to act fairly and in good faith in handling claims submitted *by* its insured, which we characterized as "a duty not to withhold unreasonably payments due under a policy." (9 Cal.3d at p. 573.) Thus, we held, when an insurer "fails to deal fairly and in good faith with its insured by refusing, without proper cause, to compensate its insured for a loss covered by the policy, such conduct may give rise to a cause of action in tort for breach of an implied covenant of good faith and fair dealing." (*Id.,* at p. 574.) It is an asserted breach of the latter

---

[3]The trial court properly ruled that because Mrs. Neal had died prior to trial no damages for emotional distress were recoverable. (Prob. Code, § 573.)

duty which forms the basis of this litigation and upon which the challenged judgment rests.

■ We can deal briefly with Farmers' first contention—that there was no substantial evidence that it had breached the aforesaid duty. Suffice it to say that the substantial record herein, which we have summarized only in broad outline above, contains abundant evidence, a good deal of it conflicting, on the subject of defendant's conduct and motives. While some of that evidence was to the effect that Farmers did no more here than assert its legal position reasonably and in good faith, the jury herein clearly concluded to the contrary. ■ ■
■ It did so on the basis of evidence of undeniable substantiality to the effect that Farmers knew at an early date—certainly no later than its receipt of Mr. Gergen's letter dated May 1, 1971—that it had no colorable defense to plaintiff's claim under the uninsured motorist provisions of its policy and that the only genuine issue was that of the availability of an offset for the $5,000 paid by it under the medical payment provisions;[4] that Mr. Gergen's offer to settle for an additional $10,000, reserving the offset question for later decision by an appropriate tribunal, was wholly reasonable and should in good faith have been promptly accepted; and that Farmers' subsequent refusal to accept the offer constituted a breach of its obligation to deal fairly and in good faith with its insured by "refusing, without proper cause, to compensate its insured for a loss covered by the policy." (*Gruenberg, supra,* at p. 574.)[5] The function of an

---

[4]On the date in question Farmers had received the report of its attorney indicating that any contributory negligence on the part of Mr. Neal could not be imputed to Mrs. Neal (see Civ. Code, § 5112) and therefore that the only issue on liability *vel non* was whether negligence was present on the part of the uninsured motorist. That report, as indicated above, concluded that the case was "50-50" on liability, but it predicated this conclusion on the truth of a statement given by Linda Lane, who was an occupant in the vehicle which struck the Neals and may or may not have been the driver thereof. The report does not indicate that the physical evidence at the scene was considered as it related to the matter of the speed of the vehicle, and it further appears that the attorney was not advised of serious questions which had arisen as to the identity of the true driver and the credibility of Linda Lane.

An in-house "summary report" dated February 5, 1971—which report was provided to the attorney for consideration in the preparation of his opinion—had indicated that it was the opinion of the writer, the claims supervisor, that "probably the insured driver was negligent and the 'B' driver [uninsured motorist] was negligent."

Mr. Gergen's letter of May 1, which was written in response to the attorney's opinion, was not forwarded to the attorney for his consideration, although as above noted it contained information relevant to the matter of the uninsured motorist's negligence, including a review of the physical evidence relating to speed (see fn. 2, *ante*) and an indication of the serious doubts which had arisen as to the credibility of Linda Lane.

[5]The terms "good faith" and "bad faith," as used in this context in *Gruenberg* (see also *Silberg* v. *California Life Ins. Co.* (1977) 11 Cal.3d 452, 461 [113 Cal.Rptr. 711, 521 P.2d

appellate court upon the review of a question of substantial evidence, and the "beginning and ending" of our power in that respect, are too well known to require reiteration here. (See *Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362]; *Primm* v. *Primm* (1956) 46 Cal.2d 690, 693 [299 P.2d 231]; *Estate of Bristol* (1943) 23 Cal.2d 221, 223-224 [143 P.2d 689]; *Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].)

■ Farmers' second contention—that there was no substantial evidence to support an award of punitive damages—is similarly without merit. ■ "In order to justify an award of exemplary damages, the defendant must be guilty of oppression, fraud or malice. (Civ. Code, § 3294.) He must act with the intent to vex, injure, or annoy, or with a conscious disregard of the plaintiff's rights. [Citations.]" (*Silberg* v. *California Life Ins. Co., supra,* 11 Cal.3d 452, 462.) ■ As we have pointed out above, there was substantial evidence before the jury to support a finding that defendant had breached its duty to deal reasonably and in good faith with its insured, rendering Farmers liable to pay compensatory damages for all detriment proximately caused by that breach (see Civ. Code, § 3333). However, as we emphasized in *Silberg* v. *California Life Ins. Co., supra,* 11 Cal.3d 452, at pages 462-463, such a determination does not in itself establish that defendant acted with the quality of intent that is requisite to an award of punitive damages. For this we must look further—beyond the matter of reasonable response to that of motive and intent.

We are satisfied, after an examination of the whole record in a light most favorable to the judgment (see *Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 65 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878]), that an award of punitive damages was here proper. There was substantial evidence before the jury from which it might reasonably have

1103]; cf. *Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425, 429 [58 Cal.Rptr. 13, 426 P.2d 173]; *Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 659 [328 P.2d 198, 68 A.L.R.2d 883]), are not meant to connote the absence or presence of positive misconduct of a malicious or immoral nature—considerations which, as we shall indicate below, are more properly concerned in the determination of liability for *punitive* damages. Here we deal only with the question of breach of the implied covenant and the resultant liability for *compensatory* damages. As stated by the draftsmen of the Restatement of Contracts, "[t]he phrase 'good faith' is used in a variety of contexts, and its meaning varies somewhat in the context. Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes [from consideration] a variety of types of conduct characterized [in other contexts] as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness." (Rest.2d Contracts (Tent. Draft Nos.' 1-7) § 231, com. a.)

concluded that defendant Farmers here acted maliciously, with an intent to oppress, and in conscious disregard of the rights of its insured.[6] That evidence, in brief, indicated that Farmers' refusal to accept Mr. Gergen's offer of settlement, and its subsequent submission of the matter to its attorney for opinion,[7] were all part of a conscious course of conduct, firmly grounded in established company policy,[8] designed to utilize the lamentable circumstances in which Mrs. Neal and her family found themselves, and the exigent financial situation resulting from it, as a lever to force a settlement more favorable to the company than the facts would otherwise have warranted. The presence in the record of evidence to the contrary can be of no moment to this court for present purposes. Clearly, the record supports an award of punitive damages against Farmers.[9]

■ Defendant Farmers next complains of certain evidentiary rulings made by the trial court. First it urges that the trial court erred when it refused to admit into evidence its exhibits marked "A" and "B" for identification. The first of these was the entire case file of defendant's attorney, consisting of some 386 pages, and the latter was the entire case file of defendant Farmers, consisting of some 354 pages. It is urged that these materials, especially those relating to the arbitration proceeding, were relevant on the issue of bad faith. It appears, however, that the trial court, correctly assessing these documents as containing substantial quantities of selfserving hearsay and irrelevant matter, ruled that any

---

[6]It is true that the record contains no *direct* evidence that defendant, in pursuing the course of conduct that it did, acted with the indicated motivation and intent. However, as we said in *Bertero*, the requisite state of mind, often referred to as "malice in fact," may be proved "either expressly (by direct evidence probative on the existence of hatred or ill will) or by implication (by indirect evidence from which the jury may draw inferences). (*Davis* v. *Hearst, supra*, 160 Cal. 143, 162 [116 P. 530].)" (13 Cal.3d at p. 66.) The record herein is replete with evidence of the latter variety.

[7]As indicated above (see fn. 4, *ante*), there was evidence in the record from which the jury could have properly concluded that Farmers, in seeking the opinion of its attorney, failed to disclose to him all of the pertinent information available to it.

[8]Included in the record is a copy of, or an excerpt from defendant's "Claims Representative Field Manual," which inter alia provides the representative with the following advice: "It is important for the claims representative to learn how to sense opportune times for settlement. This will apply whether or not the claimant is represented by an attorney. Such things as a marriage or death in the family, the purchase of a home or automobile will present the ordinary claimant with a financial situation which will suggest to him the advisability of getting his money out of his claim. If the injury is such that settlement may be tactfully approached, the claims representative should follow through with appropriate discussion." In its closing paragraph the document concludes that "the psychology of settlement negotiations is a study in itself"—a statement which our review of the instant record leaves us disinclined to dispute.

[9]Here no claim is made that the award of punitive damages against Farmers was improperly grounded in the doctrine of respondeat superior.

particular documents therein would be admitted upon a proper foundational showing, but that the files in their entirety would not be admitted. Defendant thereafter offered several specific items into evidence, some of which were accepted and some of which were rejected. No prejudicial error appears in the trial court's refusal to accept the entire files into evidence, or in its rulings on specific items therein which were later offered pursuant to that ruling.

Defendant also contends that the trial court was guilty of prejudicial error when it permitted two of plaintiff's witnesses, Attorneys Gergen and Burton, to give opinions as experts on the subject of Farmers' bad faith or lack of it. This, defendant contends, was not a proper subject for expert opinion because it was not a matter "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) The matter of the admission of expert evidence, however, is one within the sound discretion of the trial court. (*People* v. *Cole* (1956) 47 Cal.2d 99, 105 [301 P.2d 854, 56 A.L.R.2d 1435].) We can conceive of many ways in which a lay jury, in assessing the conduct and motives of an insurance company in denying coverage under its policy, could benefit from the opinion of one who, by profession and experience, was peculiarly equipped to evaluate such matters in the context of similar disputes. Moreover, the jury was specifically instructed that it was not bound by the opinions of such witnesses but should give such opinions the weight to which they thought them entitled in view of the qualifications and credibility of the witnesses and the reasons given by them in support of their opinions. No abuse of discretion here appears.

We are thus brought to what we conceive to be the most significant contention raised by Farmers in its appeal—to wit, that "the judgment, even as modified by the court, was excessive, being the result of passion and prejudice." The arguments presented under this heading in our view are addressed to two different issues. The first is whether the conduct of plaintiff's counsel at trial had the effect of injecting irrelevant, prejudicial, and misleading evidence and argument into the proceedings, resulting in a verdict tainted by passion and prejudice. The second is whether the verdict, as reduced, is excessive as a matter of law. We address each of these contentions in order.

It is first urged that counsel was guilty of misconduct in placing before the jury, by various means, what defendant refers to as the "third party argument." In short it appears that counsel, by means of questions

asked and argument made by him, sought to indicate to the jury that Farmers' conduct should be gauged not in the context of its policy limits but in the context of the total "value" of the injuries suffered by Mrs. Neal in the underlying accident, which was indicated to be in the neighborhood of $500,000. ■ This approach was apparently suggested to counsel by our opinions in *Comunale* and *Crisci, supra,* wherein we held that where an insurer in violation of its duty of reasonable and fair dealing refuses to settle a within-limits claim of a third person against its insured, it can be held liable for the full amount of any judgment subsequently rendered against the insured *without regard to policy limits.* Such a principle clearly has no application in the instant context, and we hasten to condemn counsel's intimation before the jury that it does. As we have pointed out above, an insurer's breach of its duty of good faith and fair dealing renders it liable for any damages which are the proximate result of that breach. In the so-called "third party" situation, of which *Comunale* and *Crisci* are representative, the breach of duty may have as its proximate result the entry of a judgment in excess of policy limits against the insured. In a situation such as that before us, which the parties hereto are pleased to term a "first party" situation, the injuries of the plaintiff, being sustained prior to the alleged breach, cannot be a proximate result of that breach, and therefore cannot serve as a proper measure of damages. Only damages proximately resulting from the breach—such as consequent economic loss or emotional distress, for example—are recoverable as *compensation* therefor. (See *Gruenberg, supra,* at pp. 579-580; *Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 401-402 [89 Cal.Rptr. 78, 47 A.L.R.3d 286].)

■ In spite of the foregoing, however, we do not believe that the conduct complained of was prejudicial to defendant in light of the whole record. As we shall point out below, the extent and severity of Mrs. Neal's injuries—and defendant's knowledge thereof—was a matter relevant to the jury's determinations relative to *punitive* damages. Moreover, the instructions of the court made it clear to the jury that it was not to consider the "value" of Mrs. Neal's injuries as an element of compensatory damages.[10] In these circumstances we cannot conclude that the jury was or might have been misled in this respect.

---

[10]The jury was specifically instructed as follows: "You are not to award damages in this case for any bodily injuries to Frances Neal resulting from the automobile accident or for mental or emotional distress, if any, suffered by her at any time." It was also instructed that "a legal cause of damage is a cause which, in natural and continuous sequence, produces the damage, and without which the damage would not have occurred."

Defendant also complains of certain alleged misstatements of the evidence occurring during the course of certain "expert" testimony by one of plaintiff's attorneys and of other alleged misstatements occurring during argument. We have fully examined the record in this respect and find that in each asserted instance the testimony or argument was either a proper statement of the record or was subject to prompt cure by objection and request for admonition.

■ Defendant's final contention concerning the conduct of plaintiff's counsel relates to asserted "appeals to passion" which, defendant urges, had the effect of tainting the entire proceeding. It is urged that plaintiff's counsel, by means of unremitting reference to Mrs. Neal's grievous condition following the accident, her subsequent death from cancer, and the similar fate of her son—and by contrasting against these the wealth of the defendant—sought to inflame the passions of the jury against defendant. That counsel was eminently successful in this, Farmers urges, is evidenced by the size of the verdict rendered.

Our review of the record indeed discloses that plaintiff's counsel, from opening statement to the last line of closing argument, was extremely diligent in his efforts to place before the jury at every opportunity the sorry details of Mrs. Neal's condition following the accident, the fact of her subsequent death from cancer, and the compounded tragedy of her son's demise from the same disease. It also appears that counsel took pains to contrast this lamentable situation against the admitted net worth of Farmers and to suggest that oppression was the inevitable result. Counsel's zeal in this respect in some instances led him into excesses, which on more than one occasion earned him reproof on the part of the trial judge. We have no doubt that similar warnings, along with appropriate admonitions to the jury, might well have followed on other occasions if objection and a proper request for admonition had been lodged by opposing counsel. It is clear, however, that the facts on which counsel based this tactic—at least in conjunction with other evidence on the matter of Farmers' awareness of such facts—were clearly relevant to the issues before the jury in the matter of punitive damages. Thus, in determining whether Farmers, in breaching its duty to the insured to make a reasonable settlement, did so in a spirit of oppression, the jury was clearly entitled to consider evidence of the situation of the insured at the time of the proffered settlement insofar as that situation was known to the insurer and might be considered to have motivated its actions. In view of all of these circumstances we cannot conclude, as defendant would have us, that the verdict as reduced by the trial court resulted from

passion and prejudice induced by the conduct of counsel here complained of.

 We next consider Farmers' contention that the verdict even as reduced by the trial judge upon plaintiff's consent to remittitur, was excessive as a matter of law.

Before proceeding to the merits of this contention we think it necessary to address ourselves briefly to a matter of practical significance. As noted at the outset of this opinion, the jury herein was supplied with and returned an undifferentiated verdict form, i.e., one providing a single space for the insertion of the amount of damages, without any means for segregating the total amount into its compensatory and punitive components. We can see no justification for this practice in a case wherein damages of both varieties are sought, and we herewith disapprove it. In most cases the use of such a form would make review of questions of excessive damages next to impossible for both the trial court on a motion for new trial and an appellate court on appeal. Fortunately, however, we are able to avoid this problem in the instant case. Here, because plaintiff was precluded by statute from recovering damages for any emotional distress suffered by Mrs. Neal (see fn. 3, *ante*), and because all parties and the trial court were agreed that economic damages consequent upon the defendant's alleged breach of duty amounted to no more than $10,000, it can be concluded that the balance of the original verdict represented punitive damages. Applying the same procedure to the verdict as reduced by the trial court, we can conclude with reasonable certainty that the amount of punitive damages awarded was in the neighborhood of $740,000.[11] It is to this figure, then, that we shall look in determining whether the punitive[12] damage award was excessive.

 As we pointed out in *Bertero* v. *National General Corp., supra,* 13 Cal.3d 43, our review of punitive damage awards rendered at the trial level is guided by the "historically honored standard of reversing as excessive only those judgments which the entire record, when viewed most favorably to the judgment, indicates were rendered as the result of passion and prejudice. . . ." (13 Cal.3d at p. 65, fn. 12.) Stating the matter

---

[11]The record in fact provides a reasonable basis for concluding that the amount of punitive damages included in the reduced verdict was exactly $740,000, which is the difference between the total verdict as reduced ($749,011.48) and the amount of consequential damages claimed by plaintiff in his memorandum of points and authorities in opposition to the motion for new trial ($9,011.48).

[12]No claim is here made that the award was excessive insofar as it awarded compensatory damages.

somewhat differently in a similar case, we indicated that an appellate court may reverse such an award "only ' "[w]hen the award as a matter of law appears excessive, or where the recovery is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice." ' " (*Schroeder* v. *Auto Driveaway Co.* (1974) 11 Cal.3d 908, 919 [114 Cal.Rptr. 622, 523 P.2d 662].)

In making the indicated assessment we are afforded guidance by certain established principles, all of which are grounded in the purpose and function of punitive damages.[13] One factor is the particular nature of the defendant's acts in light of the whole record; clearly, different acts may be of varying degrees of reprehensibility, and the more reprehensible the act, the greater the appropriate punishment, assuming all other factors are equal. (See *Bertero* v. *National General Corp., supra,* 13 Cal.3d 43, 65; *Fletcher* v. *Western National Life Ins. Co., supra,* 10 Cal.App.3d 376, 408-409; *Ferraro* v. *Pacific Fin. Corp.* (1970) 8 Cal.App.3d 339, 352-353 [87 Cal.Rptr. 226].) Another relevant yardstick is the amount of compensatory damages awarded; in general, even an act of considerable reprehensibility will not be seen to justify a proportionally high amount of punitive damages if the actual harm suffered thereby is small. (But cf. *Finney* v. *Lockhart* (1950) 35 Cal.2d 161, 164 [217 P.2d 19].) Also to be considered is the wealth of the particular defendant; obviously, the function of deterrence (see fn. 13, *ante*), will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort. (See *Bertero, supra,* at p. 65; *Roemer* v. *Retail Credit Co.* (1975) 44 Cal.App.3d 926, 937 [119 Cal.Rptr. 82]; *Wetherbee* v. *United Ins. Co. of America* (1971) 18 Cal.App.3d 266, 270-271 [95 Cal.Rptr. 678]; *Ferraro* v. *Pacific Fin. Corp., supra,* 8 Cal.App.3d 339, 353; *MacDonald* v. *Joslyn* (1969) 275 Cal.App.2d 282, 293-294 [79 Cal.Rptr. 707, 35 A.L.R.3d 641].) By the same token, of course, the function of punitive damages is not served by an award which, in light of the defendant's wealth and the gravity of the particular act, exceeds the level necessary to properly punish and deter.

Applying the foregoing considerations to the case before us, we cannot conclude that the award here in question was excessive as a matter of law. Looking at the record as we must in a light most favorable to the judgment (*Bertero, supra*), it appears that the jury and the court could properly have concluded that the conduct of Farmers in this case was

[13]The purpose of punitive damages is to punish wrongdoers and thereby deter the commission of wrongful acts. (*Evans* v. *Gibson* (1934) 220 Cal. 476, 490 [31 P.2d 389]; *Fletcher* v. *Western National Life Ins. Co., supra,* 10 Cal.App.3d 376, 409.)

highly reprehensible, involving a calculated attempt on the part of the insurer to take advantage of the series of tragedies afflicting Mrs. Neal and her family in order to effect a settlement at a bargain price and thereby retain monies rightfully due to the insured. Although the amount of compensatory damages legally recoverable was limited to a relatively modest amount (no more than $10,000) by the fortuitous occurrence of Mrs. Neal's death prior to trial (see fn. 3, *ante*), we think it likely that absent this limitation plaintiff would have recovered a substantial additional amount in compensation for emotional distress suffered by Mrs. Neal as a consequence of the insurer's breach of duty. In these circumstances we cannot allow the apparent disproportion between recoverable compensatory damages and the total award as reduced to lead us to nullify the award. (See and compare *Finney* v. *Lockhart, supra,* 35 Cal.2d 161; *Kluge* v. *O'Gara* (1964) 227 Cal.App.2d 207 [38 Cal.Rptr. 607]; *Sterling Drug, Inc.* v. *Benatar* (1950) 99 Cal.App.2d 393, 400-402 [221 P.2d 965].) Finally, we note that the amount of punitive damages represented by the reduced judgment (i.e., approximately $740,000) represents less than one-tenth of 1 percent of defendant's gross assets and less than a week's worth of its net income according to 1974 figures. As we said in *Bertero,* punitive damages are awarded against defendant " 'for the sake of example and by way of punishing' him (Civ. Code, § 3294.) It follows that the wealthier the wrongdoing defendant, the larger the award of exemplary damages need be in order to accomplish the statutory objective. [Citations.]" (*Bertero, supra,* at p. 65.) We determine on the record before us that here, as in *Wetherbee* v. *United Ins. Co. of America, supra,* 18 Cal.App.3d 266, 271, the jury and the trial court "could reasonably conclude that an award equal to one week's earnings was required to effect the necessary punishment of defendant and to serve as an example for other insurers." (Cf. *Zhadan* v. *Downtown L. A. Motors* (1976) 66 Cal.3d 481, 499-501 [136 Cal.Rptr. 132].) We therefore decline to hold that the jury's award, as reduced by the trial court with consent of the plaintiff, was excessive as a matter of law.[14]

---

[14]We take this opportunity to express our disagreement with the notion, suggested in the briefs amicus curiae filed in support of defendant Farmers, that substantial awards of punitive damages against insurers are to be discouraged because such awards will be "passed on" to consumers in the form of higher future premiums. It is quite true that an insurer which has been subjected to a substantial award of punitive damages may decide to raise future premiums in order to offset that award. This does not necessarily mean, however, that competing insurance companies which have *not* sustained such an award will follow suit. In fact, the principles upon which the American system of free enterprise is based would suggest to the contrary—i.e., that other companies would proceed to capitalize upon the resulting competitive advantage. If the ultimate result is to cause the offending company to lose business to those whose practices have not been such as to subject them to substantial punitive awards, it would seem that the object of deterrence will be well served—resulting in an ultimate benefit to insurance consumers as a whole.

## PLAINTIFF'S CROSS-APPEAL

Plaintiff raises two contentions. The first is that the trial court, in its order conditionally granting a new trial on the issue of damages, did not comply with the requirements of section 657 of the Code of Civil Procedure relating to the specification of reasons. The second is that even if there was such compliance, the order was erroneous because it lacked substantial support in the record. It is therefore urged that the verdict of the jury must be reinstated.

We set forth the full text of the challenged order in the margin.[15]

At the outset of our consideration of plaintiff's first contention we are met with the question, raised by defendant, whether the requirements of section 657 are applicable at all to an order such as that before us. It is argued that the conditional nature of the order renders the granting of a new trial contingent upon the plaintiff's failure to consent to remittitur, and that upon the entry of such consent the order becomes an

---

[15]"NEAL VS FARMERS INSURANCE EXCHANGE, ET AL.

"Motion of defendant for judgment notwithstanding the verdict having heretofore been denied and the matter of motion of defendant for new trial having heretofore been taken under submission on June 12, 1975, the Court now rules as follows: The motion for a new trial is granted as to the issue of damages only on the ground that the damages are excessive, subject to the condition that said motion is denied if within ten days after entry of this order the plaintiff consents by a writing filed with the court to a reduction of the verdict to the sum of $749,011.48. The Court is convinced from the entire record and from weighing the evidence that the jury should have reached a different verdict. The Court's reasons for conditionally granting the motion on the ground stated are the following:

"1. The amount of the verdict appears to be the result of passion on the part of the jury.

"2. Counsel for plaintiff stoked such passion by repeated references to 'Mrs. Neal lying paralyzed in her bed,' by stating in argument 'Frances is looking down on us' (Frances being Frances Neal the decedent and injured person whose injuries gave rise to the claim under the uninsured motorist and medical coverage provisions of the policy) and by asking a witness, a sales agent of defendant if he sold 'Declaratory Relief and Arbitration.'

"3. The special damages recoverable on the issue before the jury, i.e., breach of the duty of good faith and fair dealing were less than $10,000.

"4. The fact that there were two deaths in the Neal family from cancer within a short period of time would tend to arouse sympathy in the minds of the jurors.

"5. The amount of the verdict exceeds the amount necessary to act as a deterrent to the defendant and others.

"6. The amount of the verdict exceeds the amount necessary to punish in a manner consistent with the offense."

unconditional denial of the motion for new trial.[16] An order *denying* a motion for a new trial, it is pointed out, is not subject to the specification requirements of section 657.

We find that defendant's argument, while ingenious, is unpersuasive. An order conditionally granting a new trial is no less of an order granting a new trial than an unconditional order of the same nature. The fact that a plaintiff, by consenting to reduce (or a defendant, by consenting to add to—see Code Civ. Proc., § 662.5, subd. (a)), the verdict rendered by the jury may provide the condition requisite to transforming that order into an order of denial does not alter this. Clearly, the reasons underlying the requirement of specification—i.e., "encourage[ing] careful deliberation by the trial court before ruling on the new trial motion and [making] a sufficiently precise record to permit meaningful appellate review" (*Stevens* v. *Parke, Davis & Co.* (1973) 9 Cal.3d 51, 61 [107 Cal.Rptr. 45, 507 P.2d 653])—are equally applicable whether or not the plaintiff (or defendant in a case of additur) chooses to accede to the alteration of the jury's verdict indicated by the order. ▆ We therefore hold that the requirements of section 657 are applicable to conditional new trial orders entered pursuant to the provisions of section 662.5 of the Code of Civil Procedure, even when subsequent actions of a party fulfilling a condition stated therein have the effect of negating that order for new trial.[17]

▆ We believe that the subject order stated the reasons underlying it with sufficient specificity to satisfy the requirements of section 657 and the cases interpreting it. ▆ As we said in the seminal case of *Mercer* v. *Perez* (1968) 68 Cal.2d 104, at page 115 [65 Cal.Rptr. 315, 436 P.2d 315], the statute "should be given a reasonable and practical construction. [Citation.] To avoid overtaxing our already burdened trial courts, it will be sufficient if the judge who grants a new trial furnishes a concise but clear statement of the reasons why he finds one or more of the grounds of

---

[16]The questioned order is in the proper statutory form. Section 662.5 of the Code of Civil Procedure provides in relevant part:

"In any civil action where after trial by jury an order granting a new trial limited to the issue of damages would be proper, the trial court may in its discretion: . . .

"(b) If the ground for granting a new trial is excessive damages, make its order granting the new trial subject to the condition that the motion for a new trial is denied if the party in whose favor the verdict has been rendered consents to a reduction of so much thereof as the court *in its independent judgment determines from the evidence to be fair and reasonable.*" (Italics added.) ^

[17]We note that two decisions of the Court of Appeal have reached the same result by implication. (*Miller* v. *National American Life Ins. Co., supra,* 54 Cal.App.3d 331, 345-346; *Pease* v. *Beech Aircraft Corp.* (1974) 38 Cal.App.3d 450, 470-471 [113 Cal.Rptr. 416].)

the motion applicable to the case before him. No hard and fast rule can be laid down as to the content of such a specification, and it will necessarily vary according to the facts and circumstances of each case."

■ Here the ground of the ruling was that of excessive damages. Although we have indicated that when a motion for new trial is granted on this ground the order should "indicate the respects in which the evidence dictated a less sizeable verdict" (*Stevens* v. *Parke, Davis & Co., supra,* 9 Cal.3d 51, 62), we think that somewhat different considerations apply when, as here, it is the amount of *punitive* damages awarded which is the primary concern. In such a case we think that the specification is adequate when, as here, it makes reference to those aspects of the trial proceedings which, in the trial court's view, improperly led the jury to inflate its award. Here the court pointed to three instances in which in its view plaintiff's counsel overstepped the bounds of proper conduct in a manner tending to inflame the jury against defendant. It also indicated certain factual circumstances of the case whose presentation before the jury, although relevant and proper, tended to foster sympathy in favor of plaintiff. Finally, it made reference to the three guidelines to which we have referred above for the assessment of damages in light of a claim of excessive amount (i.e., proportion of punitive to compensatory damages, reprehensibility of conduct, and punitive effect) and indicated its conclusion, based upon an independent assessment of the evidence (see fn. 16, *ante*), that the verdict was excessive under each of these tests. Although we believe that a fuller statement might have been made in this latter respect, indicating the factual basis for these conclusions in greater detail, we hold that the court's statement of reasons was adequate to satisfy the requirements of section 657.

We proceed to the question of whether the challenged order, even if supported by a proper specification of reasons, was nonetheless erroneous because it lacked substantial support in the record. ■ In addressing this question we are guided by certain basic principles. The first is that when a trial court grants a new trial on the issue of excessive damages, whether or not such order is conditioned by a demand for reduction, the presumption of correctness normally accorded on appeal to the jury's verdict is replaced by a presumption in favor of the order. Thus, as we said in the early case of *Doolin* v. *Omnibus Cable Co.* (1899) 125 Cal. 141 [57 P. 774], "Whatever may be the rule which should govern the trial judge, it is certain that when his action in granting a new trial on the ground of excessive damages, or requiring a reduction of the amount as the condition of denying one, comes to be reviewed on appeal, his order

will not be reversed unless it plainly appears that he abused his discretion; and the cases teach that when there is a material conflict of evidence regarding the extent of damage the imputation of such abuse is repelled, the same as if the ground of the order were insufficiency of the evidence to justify the verdict." (125 Cal. at pp. 144-145; see also *Harrison* v. *Sutter St. Ry. Co.* (1897) 116 Cal. 156, 161 [47 P. 1019].) The reason for this is that the trial court, in ruling on the motion, sits not in an appellate capacity but as an independent trier of fact. Thus, as pointed out above (see fn. 16, *ante*), section 662.5 of the Code of Civil Procedure, dealing with orders for a new trial conditioned on additur or remittitur, indicates that such orders shall be made unless the affected party consents to the addition to or reduction "of so much [of the verdict] as the court *in its independent judgment determines from the evidence to be fair and reasonable.*" (Italics added.)

It is clear that no abuse of discretion has here occurred. Although some of the reasons stated by the trial court in support of its action might be held insufficient to justify reduction in the amount of a verdict as a matter of law *by an appellate court*—we have particular reference here to the court's reliance on the disparity between proved compensatory damages and the size of the undifferentiated verdict—at least one of its reasons depends upon the court's independent assessment of the reprehensibility of the defendant's conduct in the circumstances. (See fn. 15, *ante*, specification No. 6.) As we have indicated the evidence bearing on this question was in substantial conflict. That conflict was for the trial court to resolve on the motion for new trial.[18]

The judgment is affirmed. The parties shall bear their own costs on appeal.

Bird, C. J., Tobriner, J., Mosk, J., and Newman, J., concurred.

**RICHARDSON, J.**—I respectfully dissent, and amplify somewhat on the factual recitation of the majority. On July 13, 1970, William Neal, while driving the family automobile in which his wife Frances was riding, made a left turn at an intersection in front of an oncoming car driven by an

---

[18]Section 657 of the Code of Civil Procedure provides that an order granting a new trial on the ground of excessive damages "shall be reversed on such ground only if there is no substantial basis in the record for any such reasons [i.e., the reasons stated by the court in its order or specification]." The same rule is applicable when the court grants a conditional order under section 662.5. (See *Miller* v. *National American Life Ins. Co., supra,* 54 Cal.App.3d 331, 346.)

uninsured motorist which then struck the Neal car. Mrs. Neal sustained serious personal injuries.

At the time of the accident Neal was insured by defendant Farmers Insurance Exchange (Farmers) under a policy which contained a medical payment provision with limits of $5,000, and uninsured motorist coverage of $15,000 (the UM coverage). The policy provided in part: "Coverage C . . . (1) determination as to whether the insured . . . is legally entitled to recover such damages, and (if so entitled) the amount thereof, shall be made by agreement between the insured or such representative and the Company or, in the event of disagreement by arbitration: . . ." The policy also contained what is described as "a standard offset" provision which stated: "Limits of Liability Under Part II: . . . (C) Any loss payable to any person under the terms of this Part II [uninsured motorist provision] shall be reduced by . . . (2) the amounts paid or due to be paid under any valid and collectible automobile medical expense insurance available to the insured." A similar statutory offset provision was contained in the following language of Insurance Code section 11580.2, subdivision (h) then in effect: "Any loss payable under the terms of the uninsured motorist endorsement on coverage to or for any person may be reduced: . . . (2) by the amounts paid or due to be paid under any valid and collectible automobile medical payment insurance available to the insured. This paragraph shall remain in effect until December 31, 1970, and shall have no force after that date." The UM coverage was mandatory.

It was undisputed that the injuries to Mrs. Neal were so severe that if she was entitled to receive any uninsured motorist benefits under the terms of the policy she would be entitled to the maximum $15,000 coverage, subject to the offset provisions above described. The record before us does reflect, however, a serious question as to whether there was any negligence on the part of the uninsured motorist. A police investigation initiated immediately after the accident, which included police interviews with eyewitnesses, resulted in the issuance of a traffic citation to *Mr. Neal* for making an illegal left turn into the path of an oncoming vehicle. No citation was issued to the uninsured motorist. It is fundamental, of course, that if there was no negligence on the part of the uninsured motorist, Mrs. Neal would not be entitled to payment under the general UM coverage no matter how severe her injuries.

Any dispute as to defendant's liability on the uninsured motorist claim did not, of course, affect its obligation for medical payments and in

October 1970, shortly after Mrs. Neal's attorney, Mr. Gergen, filed the requisite proof of claim forms, Farmers paid Mrs. Neal the full amount of the $5,000 medical payment exposure under the policy.

The matter of the uninsured motorist payment, however, remained unresolved. Farmers, believing that under both statutory and policy terms it might have defenses on liability as well as on the offset, sought the advice of legal counsel. A substantial delay ensued. On April 11, 1971, its counsel advised defendant that in the event of arbitration or trial there was a substantial likelihood that the uninsured motorist would not be found negligent, and characterized the case as "50-50." Examining the offset problem counsel also concluded that while the point was not clear because of a recent change in law, which had not been clarified by any appellate opinion, defendant should be entitled to an offset. The defense attorney advised Farmers to arbitrate its liability and to litigate through a declaratory relief action the offset issue.

Immediately following the receipt of this opinion defendant, because it believed its maximum uninsured motorist exposure was $10,000 (the $15,000 UM coverage less the $5,000 medical payment offset) and its chances of successfully defending the suit "50-50," offered $5,000 additional payment in full settlement of the claim. This was rejected and Farmers, in turn, declined a counteroffer from plaintiff's counsel that it pay $10,000 immediately and that the matter of the offset become the subject of a declaratory relief action. Subsequently, on May 11, 1971, plaintiff's counsel revoked his previous offer and demanded $15,000 within 10 days, failing which he advised Farmers that the Neals would seek "realistic damages in the sum of $500,000." Defendant did not respond. In the subsequent arbitration Mrs. Neal was awarded the full $15,000 after the arbitrator concluded that defendant was not entitled to any offset. Farmers promptly paid Mrs. Neal the $15,000 as ordered.

Thereafter, Mrs. Neal filed the present action contending that defendant was guilty of bad faith in offering only a 50 percent settlement and in failing to pay her the full uninsured motorist benefits before arbitration occurred. The jury concluded that there was bad faith by defendant in refusing to pay Mrs. Neal the full policy limit on the disputed claim. The majority concedes that the evidence in support of this conclusion was very thin but insists that it was sufficient measured by the applicable appellate standards. (*Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].) In my opinion the question of bad faith is very close. There was no showing that defendant's employees

or representatives subjected the Neals to unethical treatment or that the tragic crisis that engulfed the Neal family (the subsequent deaths from cancer of both Mrs. Neal and her adult son) was even a subject of consideration in any regard. The majority stress an excerpt from the company manual which encourages employees "to be sensitive to individual situations" that might influence settlement prospects. Even, however, if the manual is interpreted as encouraging high-pressure tactics, the record discloses no connection whatever between the contents of the manual and the conduct of the defendant's representative who negotiated with the Neals and their attorney. The jury may well have regarded with complete distaste the excerpts from the manual which reflected defendant's hopes that its employees would be attuned to individual circumstances that might influence settlement prospects. Nonetheless, the jury was furnished no evidence of any improper implementation of any procedure which the manual may have suggested. At all relevant times the Neal family was represented by its own independent counsel.

Deciding that the evidence is sufficient to uphold the jury's finding of bad faith, the majority states that it cannot conclude as a matter of law that the punitive damage award was unsupported by the evidence and should be overturned. I must respectfully disagree.

The trial court made an express finding that the jury's verdict of $1,548,211.35 resulted from passion and prejudice, and reduced the judgment to $749,011.48.

Because the trial court's reasoning in ruling on defendant's motion for new trial is significant, I incorporate pertinent portions thereof: "The motion for a new trial is granted as to the issue of damages only on the ground that the damages are excessive, . . . The Court is convinced from the entire record and from weighing the evidence that the jury should have reached a different verdict. The Courts [*sic*] reasons for conditionally granting the motion on the ground stated are the following: [¶] 1. The amount of the verdict appears to be the result of passion on the part of the jury. [¶] 2. Counsel for plaintiff stoked such passion by repeated reference to 'Mrs. Neal lying paralyzed in her bed,' by stating in argument 'Frances is looking down on us' . . . . [¶] 3. The special damages recoverable on the issue before the jury . . . were less than $10,000.00. [¶] 4. The fact that there were two deaths in the Neal family from cancer within a short period of time would tend to arouse sympathy in the minds of the jurors. [¶] 5. The amount of the verdict exceeds the

amount necessary to act as a deterrent to the defendant and others. [¶] 6. The amount of the verdict exceeds the amount necessary to punish in a manner consistent with the offense." I entirely agree with this analysis of the trial court.

Although there is no fixed ratio by which to determine the propriety of a punitive damage award, there is law to the effect that punitive damages should bear a reasonable relationship to the compensatory damages award. (*Forte* v. *Nolfi* (1972) 25 Cal.App.3d 656, 689 [102 Cal.Rptr. 455]; *Wilkinson* v. *Singh* (1928) 93 Cal.App. 337, 344-345 [269 P. 705].) At the least the amount of the compensatory damages, by way of general and special damages, is surely one element to be considered in measuring the reasonableness of the damages assessed by way of punishment. According to the evidence the compensatory damages could not have exceeded $10,000. The ultimate punitive award was almost three-quarters of a million dollars. I am convinced that a punitive damage award of that size is not justified by any conduct of defendant that is disclosed in this record.

We have said that " 'In considering whether the [award was] excessive, we realize the very familiar rule that to the jury, to a very large extent, is committed the responsibility of awarding compensation for an injury sustained. When the award as a matter of law appears excessive, or where the recovery is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice, the duty is then imposed upon the reviewing court to act.' " (*Cunningham* v. *Simpson* (1969) 1 Cal.3d 301, 308-309 [81 Cal.Rptr. 855, 461 P.2d 39], citing *Rosenberg* v. *J. C. Penney Co.* (1939) 30 Cal.App.2d 609, 628 [86 P.2d 696].)

The evidence of "bad faith," in my opinion, was marginal. What then led the jury to return an award of such magnitude? I have concluded that the verdict was the result of several extraneous and irrelevant factors in combination: (1) the passion and prejudice of the jury as found by the trial court, (2) the improper suggestions to the jury that defendant's conduct should be measured not by its maximum contractual liability of $20,000 but, rather, by the possible "$500,000 and up true value" of plaintiff's tort claim against a third party, and (3) the jury's natural sympathy generated by Mrs. Neal's injuries, and her subsequent death and that of her son from cancer. These causes resulted in an award which, in terms of both compensation for breach of the uninsured motorist provision and punitive damages, was grossly excessive.

Mrs. Neal's injuries were relevant to any issues of the case only insofar as they established that the value of her claim equalled or exceeded the $15,000 limit of the uninsured motorist coverage of her policy. As previously noted, defendant never contested this, but conceded that if Mrs. Neal was entitled to recover she would recover the full amount of the policy. Nonetheless, despite the total lack of any relevancy, plaintiff's counsel repeatedly described to the jury Mrs. Neal's injuries sustained in the accident. This was error, and it was serious.

The degree of this intrusion into the trial of this irrelevant and improper factor is manifest from the record. For example, on one occasion during argument when ruling on a defense objection by defense counsel, the court stated: "And that would be number 14, if we're counting the times the condition of that lady was paraded before the jury. Maybe not number 14, maybe only ten. But it seems to me as though we have now come to a point where the Court ought to exercise its discretion under 352 [Evidence Code section] and say, you have recited it enough, and that you cannot justify a further recitation of the conditions of this unfortunate lady from this witness as reasons for his opinion. A second reason I see is because there is no dispute by the defense that the valuation of the claim far exceeded the coverage of the insurance policy." Despite this clear and proper expression of the court's concern, however, it permitted the argument to be made still another time.

In conjunction with his successful attempt to evoke the sympathies of the jury by reference to Mrs. Neal's condition and the additional tragedy of the Neals' son's cancer and death, matters wholly unrelated to any issue properly before the jury, plaintiff's counsel introduced and pursued an erroneous legal theory which was premised on the mistaken notion that defendant was somehow liable for plaintiff's full "$500,000" claim for her personal injuries.

The "$500,000" figure and the erroneous legal theory which produced it appeared early in the negotiations between the Neals' then counsel, Gergen, and defendant. When Gergen on May 11, 1971, demanded payment of $15,000 within 10 days he threatened, if payment was not forthcoming, to go to arbitration and put in a claim for "realistic damages in the sum of $500,000." So far as the record discloses, it was a figure snatched wholly from thin air. In plaintiff's first amended complaint she repeated the claim, seeking ". . . c. The full damages that FRANCES NEAL would have been 'legally entitled to recover' without reference to said

policy limit of $15,000.00, for the injury said FRANCES NEAL sustained in the sum of $500,000 . . . ."

The erroneous argument measuring the extent of defendant's uninsured motorist exposure by the nature of the injury rather than with reference to the policy, as augmented by a punitive damage claim, pervaded the trial itself. Plaintiff's new counsel introduced the figure of $500,000 in his opening statement wherein he quoted third persons as stating that "cases of this type had a reasonable value of $500,000" and "it's obvious that here is a case, that cases of this kind are half a million dollar-million dollar evaluation," and he then characterized to the jury the condition of Mrs. Neal as "an injury in the five hundred thousand or above range."

During trial plaintiff's counsel produced two witnesses who testified as experts (including Mr. Gergen, plaintiff's original attorney) that Mrs. Neal's claim against *the uninsured motorist* was worth $500,000. Counsel continually stressed to the jury through these witnesses that defendant's conduct should be judged not on the basis of its maximum exposure under the policy, $20,000, but rather on the basis of the $500,000 value of Mrs. Neal's claim against the third party uninsured motorist.

The defendant's $10,000 settlement offer was repeatedly characterized as a "token" offer which should in some manner be measured against the "$500,000" figure conceived by plaintiff. This basis for measuring defendant's conduct, as reasonable or unreasonable, or in "good faith" or "bad faith," was presented to the jury throughout the trial, over defendant's objections in some instances.

In his summation to the jury, plaintiff's counsel argued: "Are they living up to the duty, fiduciary duty that they owe to their insured when they use the leverage of legal processes to force them and then the alternative to that is, however, if you will drop everything, you know, then he will pay $5,000. Five thousand dollars, a claim worth $500,000 and up, 1 percent—1 percent of the value, that's what we will offer you . . . ." Plaintiff's counsel shortly thereafter argued "In a case where the parties agree that the evaluation is in the neighborhood of $500,000 and up, and certainly there are verdicts involving that kind of injury well above that, a measure of malice, a measure of wrongful conduct, a way of looking at how wrongful their conduct was . . . to look at what was the value of the claim and how did they treat it."

The attempt by plaintiff's counsel to arouse and play upon the jury's natural feelings of sympathy and compassion was expressed in his final words to the jury: "And somehow I have the feeling that Frances Neal is smiling down on us because she left this unfinished business. I hope we can finish it for her."

Plaintiff's counsel attempted to incorporate his erroneous theory in a jury instruction, and to a degree was successful. He requested the following instruction: "In determining whether the insurer acted in good faith in refusing to settle Frances Neal's claim for bodily injury, you may take into consideration the reasonable value of her personal injury claim which is to be determined without regard to the policy limits." This instruction as written was quite properly rejected but it was read to the jury with the following questionable modifications: "In determining whether the insurer acted in good faith in refusing to settle Frances Neal's *uninsured motorist claim,* you may take into consideration the reasonable value of her personal injury claim." There can be little doubt that the instruction left the jury with the impression that it could properly consider the "$500,000" value which her counsel placed on her personal injury claim against the third party uninsured motorist. This figure had been repeatedly urged upon the jury and there is little doubt that it did in fact consider this figure regardless of any instruction that it was specifically not to award damages for the bodily injuries themselves.

This modified instruction was legally correct only in a very limited sense. As I have suggested, the value, if any, of the claim against the third party uninsured motorist was significant only in determining whether that value was equal to or exceeded the policy limit for uninsured motorist coverage. To the extent that the jury was informed that the reasonableness or unreasonableness of defendant's conduct should be determined by reference to a "$500,000" value of plaintiff's claim against the uninsured motorist, this instruction and the argument of counsel, made repeatedly, were clearly erroneous.

Plaintiff's counsel undoubtedly derived his theory from "third party" cases in which an insurance carrier has unreasonably refused to settle a within-policy-limits claim of a third person against the insured. In such cases the carrier is held liable for the full amount of any judgment rendered against the insured, because the damage to the insured is the full amount of the insured's exposure to the third party's judgment.

(*Johansen* v. *California State Auto. Assn. Inter-Ins. Bureau* (1975) 15 Cal.3d 9, 15 [123 Cal.Rptr. 288, 538 P.2d 744]; *Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 660 [328 P.2d 198, 68 A.L.R.2d 883].) The carrier's breach of its implied covenant to the insured of good faith and fair dealing has exposed the insured to the full amount of this judgment. The insured's loss is directly measurable by, and flows directly from, the carrier's breach.

This is not the case, however, in which a carrier declines to pay an insured's claim against a third party motorist. In this case, the insured's claim against the carrier is not measured in any way by the insured's claim against the uninsured motorist. Rather, we have said that the insured's recoverable damages for breaches of covenants of good faith and fair dealing generally include the economic loss, emotional distress and any other consequential damage caused to the insured by the unreasonable "bad faith" refusal to settle. (*Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 579-580 [108 Cal.Rptr. 480, 510 P.2d 1032].) If this were not the test, insurance carriers would find themselves between the Scylla of making immediate payment on a claim about which they had reasonably founded questions as to liability or the Charybdis of suffering punitive damages for failure to make quick payment, damages that, as in the instant case, far exceed any policy limits. This would not be a just rule, as quite properly noted by Justice Kaufman, speaking for a unanimous Court of Appeal herein. If the uninsured motorist carrier has acted unreasonably, damages, including punitive awards, are entirely proper but they are not measured, in logic or in fairness, by the value of the insured's claim against the uninsured motorist.

For all of the foregoing reasons, I conclude that the award of $749,011.48 should not stand. Furthermore, the fundamental nature of the errors involved here, the improper legal theory advanced, the doubtful instruction given to the jury, the repeated improper references to the figure of "$500,000," combined with the extreme and repeated appeals to the sympathies of the jury, lead me inexorably to the conclusion that had not the errors occurred and permeated the trial at so many levels not only would there not have been an award of punitive damages of the great magnitude here involved, but there exists a reasonable probability that there may have been no finding of bad faith whatever. It is on these grounds that I would reverse. (*Henderson* v. *Harnischfeger Corp.* (1974) 12 Cal.3d 663, 670 [117 Cal.Rptr. 1, 527 P.2d 353]; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

**CLARK, J.**—I concur in the dissenting opinion of Justice Richardson and add the following comments.

The California Legislature instituted arbitration as an alternative to litigation in uninsured motorist cases by requiring that disputes over liability and value be settled by agreement, or failing that, by arbitration. (Ins. Code, § 11580.2, subd. (f); see also, *Crofoot* v. *Blair Holdings Corp.* (1953) 119 Cal.App.2d 156, 183-184 [260 P.2d 156]; *Ware* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1972) 24 Cal.App.3d 35 [100 Cal.Rptr. 791].) On sharply conflicting creditable evidence of fault, Farmers offered part but the claimant demanded the total policy limit.[1]

The majority's holding, that a first party insurer may not "guess wrong," effectively abolishes the present statutory scheme for handling uninsured motorist claims. We may anticipate arbitration, pursuant to Insurance Code section 11580.2, will no longer be used to resolve these disputes because the penalty for losing in arbitration will be an automatic second proceeding in superior court for "bad faith" breach of the insurance policy. Thus, all claims must necessarily be paid regardless of how frivolous. And who is it that will ultimately bear the burden? Obviously, it is the general motoring public through massive increases in premium. Today, 25 percent of the public cannot afford car insurance.[2] Tomorrow, under the majority's strict liability holding, the percentage must increase thus creating more uninsured motorists, consequently more uninsured motorist claims. When this cycle has run its course even fewer motorists will exist who can afford insurance.

Clearly, this was not the purpose the Legislature had in mind in creating its statutory form of coverage. If these claims are to be handled on a "no fault" basis, then the Legislature should say so, but "no fault" should not be instituted by this court in punishment of insurance companies who have merely acted pursuant to the Legislature's comprehensive program.

Appellant's petition for a rehearing was denied September 27, 1978, and on September 7, 1978, the judgment was modified to read as printed above. Clark, J., and Richardson, J., were of the opinion that the petition should be granted.

---

[1] I refer to evidentiary matters set out in the opinion of Justice Richardson and my independent examination of the record which persuades me the question of liability of the uninsured motorist was in serious doubt at all stages of negotiations.

[2] Los Angeles Times (5 April 1976) part II, page 1.