Filed 6/12/13  Dunlap v. Starz Home Entertainment CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| LINDSAY DUNLAP,<br><br>　　　Defendant and Appellant,<br><br>　　v.<br><br>STARZ HOME ENTERTAINMENT, LLC,<br><br>　　　Plaintiff and Respondent. | B230069<br><br>(Los Angeles County<br>Super. Ct. No. BC373707) |

THE COURT:

It is ordered that the opinion filed herein on June 10, 2013, and not certified for publication, be modified as follows:

1.  On the title page, counsel for defendant and appellant was erroneously listed as: "Lindsay Dunlap, in pro per, for Defendant and Appellant."

It should read:

"Kulik Gottesman & Siegel and Joanna Ardalan; Lindsay Dunlap, in pro per, for Defendant and Appellant."

**WOODS, Acting P. J.**　　　　　　　**ZELON, J.**

Filed 6/10/13 (unmodified version)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| LINDSAY DUNLAP,<br><br>    Defendant and Appellant,<br><br>    v.<br><br>STARZ HOME ENTERTAINMENT, LLC,<br><br>    Plaintiff and Respondent. | B230069<br><br>(Los Angeles County<br>Super. Ct. No. BC373707) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jane Johnson, Judge. Affirmed in part and reversed in part.

Lindsay Dunlap, in pro per, for Defendant and Appellant.

Romero Law and Alan J. Romero for Plaintiff and Respondent.

_____

Lindsay Dunlap appeals from the judgment entered upon a jury verdict in favor of Starz Home Entertainment, LLC (Starz) on its complaint against Dunlap alleging causes of action for breach of contract, fraud and negligent and intentional misrepresentation arising out of Dunlap's sale of a license to certain rights she claimed to own to the "The Man from U.N.C.L.E" and "The Girl From U.N.C.L.E." (the UNCLE television series). Dunlap asserts several errors on appeal. Specifically she claims that the trial court erred in failing to dismiss or stay the action based on the forum selection clause in the parties' contract that designated New York as the proper forum for any dispute between the parties. In addition, Dunlap argues that the special verdict the jury used in this case cannot support the judgment because questions in the verdict omitted certain elements of the claims and/or were biased, ambiguous and confusing. Finally she argues that the punitive damage award must be reversed because Starz failed to present sufficient evidence of her ability to pay the award.

As we shall explain, only Dunlap's argument on the punitive damage award has merit. Accordingly, we reverse the award of punitive damages and affirm in all other respects.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

1. *The Parties*

Dunlap was the chairperson and president of an entity known as Ember Entertainment, Inc. (Ember) when the events giving rise to this case occurred.[2] Ember is a California corporation, with its principal place of business in Los Angeles; and Dunlap is a California resident. Starz is an entertainment company that supplies television programming in the United States. It is also the successor in interest of Anchor Bay Entertainment, Inc. (Anchor Bay) which was renamed and reformed as Starz in 2007.

---

[1]    The Factual and Procedural Background describes only those facts and circumstances that are relevant to the issues on appeal.

[2]    During the trial in August 2010 Dunlap testified that she was no longer affiliated with or employed at Ember and had left the company about two years before.

2

Starz is a Delaware corporation with the principal place of business in Burbank, California. Anchor Bay was a Delaware corporation with its principal place of business in Michigan.

2. *Sale of Rights to the UNCLE television series*

In 2004, Ember contacted Anchor Bay to solicit interest in the sale of exclusive license for the video and commercial rights (the "rights") to the UNCLE television series. Ember represented that it owned the rights[3] to the UNCLE television series and that it had the exclusive authority and legal capacity to sell those rights to Anchor Bay.

Thereafter in October 2005, Anchor Bay and Ember entered into a written agreement for the sale of the "exclusive and irrevocable right and license to advertise or otherwise exploit" the rights to Anchor Bay for a term of seven years. At the time it entered the contract with Ember, Anchor Bay was unaware that any other entity claimed ownership to or rights in the UNCLE television series. Between November 2005 through February 2006, Anchor Bay paid a total of $500,000 to Ember under the agreement for 106 episodes of "Man from U.N.C.L.E" and 29 episodes of "Girl from U.N.C.L.E." Anchor Bay also paid Ember an additional $125,000 for additional "value added" materials.[4]

In April 2006, Anchor Bay learned that Warner Bros. also claimed to own the exclusive distribution rights to the UNCLE television series and intended to release DVDs of the series. By December 2006, Anchor Bay also had expended (in addition to the payments made to Ember under the agreement) $85,921 in post-production costs. It

---

[3]     Ember claimed that it had received the rights to the UNCLE television series by quitclaim from the production company which created the series in the 1960s. However, the production company held ownership to the rights as a tenant in common with MGM (MGM subsequently sold its rights to various media property including the UNCLE television series to Turner Broadcasting, which ultimately sold its rights to Warner Bros.). The quitclaim to Ember acknowledged that Warner Bros. retained an interest in the rights to the UNCLE television series.

[4]     The "value-added" materials consisted of 12 hours of recorded interviews, behind the scenes documentaries and 300 still photographs.

also claimed that it lost profits of $768,925 in connection with the deal. In December 2006, Anchor Bay sought a refund from Ember for the monies it had paid under the contract. When those efforts proved unsuccessful, in July of 2007, Starz (as Anchor Bay's successor in interest), filed the instant action against Ember and Dunlap.

 *3. The Litigation*

Starz' complaint against Ember and Dunlap alleged causes of action for, among various claims, breach of contract, fraud, intentional and negligent misrepresentation. Starz also alleged that Ember operated as the alter ego of Dunlap. Dunlap and Ember failed to respond to the complaint and default was entered against them. Thereafter, the parties litigated issues related to the default and service.

In September 2008, Dunlap and Ember filed a motion to stay or dismiss the case based on a forum selection clause in the agreement between Ember and Anchor Bay which designated New York as the jurisdiction for any disputes between the parties. The court denied the motion.

In August 2010 the case proceeded to a jury trial against Dunlap.[5] During the trial, Dunlap acted as her own legal counsel. At the end of the presentation of evidence the court ruled that Dunlap was Ember's alter ego. The court instructed the jury as to the relevant law governing the claims and the jury was provided with special verdict, jointly prepared by the parties containing 25 questions on the causes of action for breach of contract, negligent and intentional misrepresentation, and fraud. The special verdict required the jury to determine the amount of compensatory damages Starz sustained. In connection with the intentional misrepresentation and fraud claims it further asked the jury to determine the amount of punitive damages to be awarded to Starz.

The jury returned the verdict in favor of Starz and awarded a total of $1,479,846 in compensatory damages for "out of pocket expenses," "post production expenses" and

---

[5] In 2009, Ember filed a cross-complaint against Starz and another party not subject of this appeal, Crest Laboratories. In July 2010 shortly before trial, the court struck Ember's answer and dismissed the cross-complaint because it was an unrepresented corporation.

"lost profits." The jury also awarded Starz $1.4 million in punitive damages.

Dunlap filed a motion for a new trial making various arguments about the conduct of the trial, the behavior of the trial judge, and jury deliberations. The notice stated the basis of the motion as insufficient evidence to support the court's ruling on the alter ego claim. The trial court denied the motion.

Dunlap appeals.

## DISCUSSION

On appeal, Dunlap asserts that the trial court committed several reversible errors. She claims that: (1) the court erred in failing to stay or dismiss the action based on the mandatory forum selection clause in the parties' agreement; (2) the special verdict contained errors and defects that are fatal to the judgment; and (3) sufficient evidence did not support the award of punitive damages. We address these claims in turn.

**I.     The Court Did Not Err in Denying Dunlap's Motion to Dismiss or Stay Based on the Forum Selection Clause.**

Dunlap argues that the court erred when it failed to grant her motion to dismiss or stay the case based on the mandatory forum selection clause in the agreement between Ember and Anchor Bay. As we shall explain, we disagree.

*A.     Background*

Anchor Bay drafted the license agreement between Ember and Anchor Bay. It contained the following provision: "This Agreement shall be binding upon the parties hereto and shall inure to the benefit of their successors, heirs, and assigns, and this Agreement and any and all disputes arising hereunder or related hereto shall be construed under the laws of the State of New York applicable to agreements to be wholly performed therein. Licensor and Licensee consent to the exclusive jurisdiction of the state and federal courts sitting in the State of New York over any and all matters arising under or related to this Agreement."

The parties litigated various matters relating to service and default, filed numerous motions and other documents, and had a number of conferences and court appearances between July 2007 and September of 2008, before Dunlap filed the motion to dismiss or

5

stay based on the forum selection clause. Starz opposed the motion pointing out that none of the parties, witnesses nor evidence relating to the case had any connection to New York.

During the hearing on the motion in December 2008, the court expressed a concern that the Starz's predecessor Anchor Bay had drafted the contract which included the forum selection clause and yet, Starz opposed its enforcement. When questioned about the clause during the hearing, Starz explained that the forum selection clause had been included in the contract by accident. Starz stated that the contract between Ember and Anchor Bay had been drafted using a template from another contract, and that the forum selection clause at issue had been unintentionally left in the final version of the agreement.

The court denied the motion. The court's ruling acknowledged that ordinarily a mandatory forum selection clause entered into knowingly and voluntarily by the parties would be given effect. However, the court also ruled, in pertinent part:

> Here, there seems to be no reasonable contacts with New York, the chosen forum. Because of that, the Court would ordinarily not be inclined to enforce the forum selection agreement, particularly in view of the long history of this case in California (having been filed in July 2007). However, this is an unusual case, one in which Plaintiff, the drafter of the agreement, seeks to avoid the effect of the forum selection clause. . . . [¶] [I]t is clear that New York lacks a relationship to the dispute. In this case, there is clearly no relationship between the parties or the transaction. Plaintiff is a Delaware LLC. Plaintiff is suing as the successor-in-interest to Anchor Bay Entertainment, Inc., which is a Michigan corporation. Defendant Ember is a California corporation. Defendant Dunlap is a California resident. Neither party suggests that the transaction had anything to do with New York. [¶] Plaintiff cites cases holding that the Court should decline to enforce a forum selection clause when the chosen state is not affordable or when all parties and witnesses are California residents. Here, it appears that all witnesses are in California. [¶] This case has a history. The Court is concerned about the amount of time it has taken to get this case from filing to 'at

6

issue' status. Defendants have been evading service, and this motion to dismiss may be read as one more 'delaying tactic.' [¶] Because of the foregoing, and in particular, the lack of any contacts with New York, the Court is inclined to deny the motion.

### B. Law Governing the Enforceability of a Forum Selection Clause

A motion to dismiss or stay based upon forum non conveniens can be brought on two grounds: a contractual forum selection clause, or the traditional ground, i.e., that the forum in which the action was filed is an inconvenient forum. (*Intershop Communications AG v. Superior Court* (2002) 104 Cal.App.4th 191, 198.) Code of Civil Procedure section 410.30 is the exclusive means for staying or dismissing a case under the forum non conveniens doctrine. (See *In re Marriage of Taschen* (2005) 134 Cal.App.4th 681, 687 ["in California forum non conveniens motions are governed by statute, not by policies embedded in case law predating the statute's enactment"]; *Britton v. Dallas Airmotive, Inc.* (2007) 153 Cal.App.4th 127, 132-134.)

The defendant, as the moving party, bears the burden of proof on a motion based on forum non conveniens. (*Animal Films, LLC v. D.E.J. Productions, Inc.* (2011) 193 Cal.App.4th 466, 472.) When the motion is brought on the traditional ground, the defendant bears the burden to show that the forum selected by the plaintiff "is a seriously inconvenient forum." (*Ford Motor Co.v. Insurance Company of North America* (1995) 35 Cal.App.4th 604, 611.) When the motion is brought on the ground that there is a mandatory[6] forum selection clause, the burden is on the plaintiff to show that enforcement of the clause would be unreasonable under the circumstances of the case. (See *Berg v. MTC Electronics Technologies Co.* (1998) 61 Cal.App.4th 349, 358.)

California courts presume the validity of forum selection clauses and consistently enforce them because they provide a degree of certainty for both businesses and their customers that contractual disputes will be resolved in a particular forum. California courts routinely enforce forum selection clauses even when the plaintiff lives far from the

---

6       Here there is no dispute that the forum selection clause at issue is mandatory.

chosen forum. (See *Intershop Communications AG v. Superior Court*, *supra,* 104 Cal.App.4th at pp. 196-202 [Hamburg, Germany forum].) Moreover, a forum selection clause may be enforced against non-signatories who are closely related to the contractual relationship. (*Net2Phone, Inc. v. Superior Court* (2003) 109 Cal.App.4th 583, 587-588.)

"Although California has a public policy in favor of access to its courts by resident plaintiffs, this is not thwarted by allowing residents to surrender this right voluntarily in the course of negotiations; "'[i]n so holding we are in accord with the modern trend which favors [enforcement] of such forum selection clauses.'" (*Cal-State Business Products & Services, Inc. v. Ricoh* (1993) 12 Cal.App.4th 1666, 1678.) Thus, when a forum selection clause has been "entered into freely and voluntarily by parties who have negotiated at arms' length," the clause will be "given effect, in the court's discretion and in the absence of a showing that enforcement of such a clause would be unreasonable." (*Smith, Valentino & Smith*, *Inc. v. Superior Court* (1976) 17 Cal.3d 491, 496.)

Consequently, a distinction has been drawn between a mandatory and a permissive forum selection clause for purposes of analyzing whether the clause should be enforced. A mandatory clause will ordinarily be given effect without any analysis of convenience; the only question is whether enforcement of the clause would be unreasonable. As the Supreme Court noted in *Smith* "[m]ere inconvenience or additional expense is not the test of unreasonableness since it may be assumed that the plaintiff received under the contract consideration for these things." (*Smith, Valentino & Smith*, *Inc. v. Superior Court, supra,* 17 Cal.3d at p. 496.) On the other hand, when the clause merely provides for submission to jurisdiction and does not expressly mandate litigation exclusively in a particular forum, then the traditional forum non conveniens analysis applies. (*Berg v. MTC Electronics Technologies Co., supra*, 61 Cal.App.4th at pp. 358-360.)

The party seeking to avoid application of a mandatory forum selection clause -- in this case, Starz -- bears a burden to prove unreasonableness. (*Net2Phone, Inc. v. Superior Court*, *supra,* 109 Cal.App.4th at p. 588; see *Cal-State Business Products & Services, Inc. v. Ricoh, supra,* 12 Cal.App.4th at p. 1680 [the burden of proof falls on the party challenging the validity of the forum selection clause].)

8

"Unreasonable" in the context of mandatory forum selection clauses has been defined as meaning that the forum selected would be unavailable, unable to accomplish substantial justice or that choice of forum lacks a rational basis in light of the facts underlying the transaction. (*Cal-State Business Products & Services, Inc. v. Ricoh, supra,* 12 Cal.App.4th at p. 1679.)

With these legal concepts in mind, we turn to the merits.[7]

Here Dunlap asserts that because the clause was mandatory and did not undermine California public policy, the court should have given it full effect. She argues that the court erroneously applied the traditional forum non conveniens test. She asserts that New York was the appropriate forum for the case because it had a substantial connection to the parties and the transaction and because New York is an entertainment capital. She also points out that the parent company of Anchor Bay was located near New York—in New Jersey and that the checks that were issued from Anchor Bay to Ember were sent from Newark, New Jersey.

In our view, the trial court did not base its holding on an inaccurate application of the law or improper view of the evidence.

Contrary to Dunlap's contention, the trial court did not apply the traditional forum non conveniens test to decide the motion. Although the court made reference to the location of evidence and witnesses, that was not the emphasis of the court's analysis. Instead, the court's chief rationale as reflected in the court's comments at the hearing and

---

[7]     A split of authority exists as to the appropriate standard of review for a motion to enforce a forum selection clause. In *Schlessinger v. Holland America* (2004) 120 Cal.App.4th 552, 557, this division followed *America Online, Inc. v. Superior Court* (2001) 90 Cal.App.4th 1, 9 and held that a trial court's decision to enforce or decline to enforce a forum selection clause is reviewed for an abuse of discretion. However, in *CQL Original Products, Inc. v. National Hockey League Players' Assn.* (1995) 39 Cal.App.4th 1347, 1354, Division One of the Fourth District held that the trial court's order denying a motion to stay or dismiss based on a contractual forum selection clause should be reviewed for substantial evidence. This split is not outcome determinative here, however, because under either of these deferential standards, this court would uphold the trial court's conclusion with respect to the forum selection clause at issue.

in the written ruling centered on whether it was reasonable to enforce the clause in light of the circumstances of the case. Specifically, the court cited the forum's lack of connection to the case. The court found New York had no rational connection to the transaction—a finding borne out by the record—which is an appropriate consideration under the prevailing law. Furthermore, under the reasonableness test the court was not precluded from considering where the parties were domiciled, where the contract was negotiated and consummated, and where the claims arose. (See *Furda v. Superior Court* (1984) 161 Cal.App.3d 418, 426 [considering the location where one of the parties was domiciled, where the contract was negotiated and performed and torts occurred in making the reasonableness determination].) The court also properly considered Dunlap's delay in seeking to raise the issue of the forum selection clause. (*Trident Labs, Inc. v. Merrill Lynch Commercial Finance Corp.* (2011) 200 Cal.App.4th 147, 155-156 [finding that under the circumstances of the case a delay of more than 19 months in bringing the motion to enforce a mandatory forum selection clause made the enforcement of the clause unreasonable].) The evidence in the record supports the court's conclusion that New York was an unreasonable forum, and none of the arguments made by Dunlap below or before this court undermine that conclusion.

Finally, in contrast to other cases involving mandatory forum selection clauses in which enforcement is justified because the parties negotiated the selection of the forum or the plaintiff received consideration in exchange for agreeing to litigate in a distant forum, here the designation of New York as the forum for any disputes was an unintentional drafting error. Selection of New York as the chosen forum was not the result of an arm's length, bargained for exchange between the parties or even a knowing and voluntary surrender of choice by either side. It was selected through inadvertence. Consequently, the primary rationale for enforcing mandatory forum selection clauses is not served in this case.

In sum, we conclude that Starz satisfied its burden to prove it would be unreasonable to enforce the forum selection clause. In view of the deferential standard of review and considering all of the evidence, the trial court did not commit reversible error

10

in denying the motion to dismiss or stay the case based on the forum selection clause in the agreement.

## II. Any Omissions, Ambiguities or Errors in the Special Verdict Were Harmless.

### A. Background

The special verdict used in this case, prepared jointly by the parties contained 25 questions. Question Nos. 1-6 pertained to the claim for breach of contract; question Nos. 7-11 centered on the negligent misrepresentation cause of action; the claim for intentional misrepresentation was addressed in question Nos. 12-16; questions numbered 17-24 related to the fraud claim and question No. 25 asked the jury to determine the amount of punitive damages. The amount of compensatory damages the jury found for each cause of action was identical – for each of the four causes of action the jury found in favor of Starz and imposed liability against Dunlap in the amount of $625,000 for lost profits, $85,921 for post production expenses and $768,925 for lost profits, for a total compensatory damage award of $1,479,846. The court subsequently entered a judgment for the compensatory damages for Starz in the amount of $1,479,846.

### B. Governing Law

"[A] special verdict is that by which the jury finds the facts only, leaving the judgment to the Court. The special verdict must present the conclusions of fact as established by the evidence, and not the evidence to prove them; and those conclusions of fact must be so presented as that nothing shall remain to the Court but to draw from them conclusions of law." (Code Civ. Proc., § 624.)

"'Unlike a general verdict (which merely *implies* findings on all issues in favor of the plaintiff or defendant), a special verdict presents to the jury each ultimate fact in the case. The jury must resolve all of the ultimate facts presented to it in the special verdict, so that "nothing shall remain to the court but to draw from them conclusions of law." [Citation.] [¶] The requirement that the jury must resolve every controverted issue is one of the recognized pitfalls of special verdicts. "The possibility of a defective or incomplete special verdict, or possibly no verdict at all, is much greater than with a general verdict that is tested by special findings . . . ." [Citation.]' [Citation.]" (*Myers*

11

*Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 959-960, original italics.)

Potentially defective special verdicts are subject to "a multilayered approach." (*Zagami, Inc. v. James A. Crone, Inc*. (2008) 160 Cal.App.4th 1083, 1091.) Prior to the jury's discharge, the trial court is obliged upon request to ask the jury to correct or clarify a potentially ambiguous or inconsistent verdict. (*Ibid*.) If the verdict is merely ambiguous, a party's failure to seek clarification of the verdict before the jury is discharged may work a forfeiture of the purported defect on appeal. (*Id.* at p. 1092, fn. 5.) However, absent forfeiture, courts may properly interpret a "merely ambiguous" verdict in light of the pleadings, evidence, and instructions. (*Ibid*.) In contrast, if the special verdicts are "hopelessly ambiguous" or inconsistent, failure to seek clarification from the jury does not create a forfeiture, and the proper remedy is ordinarily a retrial on the issues underlying the defective verdict. (*Id.* at p. 1092.)

"A special verdict is 'fatally defective' if it does not allow the jury to resolve every controverted issue." (*Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 325 (*Saxena*).) "If a fact necessary to support a cause of action is not included in such a special verdict, judgment on that cause of action cannot stand." (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 531 (*Behr*) [reversing the judgment on the misrepresentation claim because the verdict did not include an essential element on that claim, specifically, that the defendant made a misrepresentation]; *Saxena*, *supra*, 159 Cal.App.4th at pp. 325-326 [verdict form failed to ask the jury to determine whether the plaintiff failed to provide any consent at all to medical procedure, and thus the verdict failed to include an essential element to support a judgment for the plaintiffs on the battery claim]; see also *Myers Building Industries, Ltd. v. Interface Technology, Inc., supra*, 13 Cal.App.4th at pp. 959-962 [striking a punitive damage award because the special verdict asked the jury to make findings on a breach of contract claim only, not on any tort claims]; *Fuller-Austin Insulation Co. v. Highlands Ins. Co.* (2006) 135 Cal.App.4th 958, 1004-1006 [liability finding reversed because special verdict failed to make a reasonableness finding essential to liability].) "When a special verdict is used and there is no general verdict, we will not

12

imply findings in favor of the prevailing party." (*Behr v. Redmond, supra,* 193 Cal.App.4th at p. 531.)

Finally, "we analyze the special verdict form de novo." (*Saxena v. Goffney, supra,* 159 Cal.App.4th at p. 325; see also *City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 678 ["'[A] special verdict's correctness must be analyzed as a matter of law'"].)

### C.    *Dunlap's Claims*

Dunlap challenges the jury's special verdict in several respects. Specifically, she claims that certain questions in the verdict form were biased, conclusory, confusing and/or ambiguous. She also asserts the special verdict failed to include all findings required to support a judgment in Starz' favor on the causes of action for breach of contract, negligent misrepresentation and intentional misrepresentation.

#### 1.    *Challenges to Question Nos. 23 and 24 in the Special Verdict Relating to Damages Based on Confusion, Ambiguity or Bias.*

Dunlap complains that question No. 23[8] in the special verdict is confusing and ambiguous because it allowed the jury to treat Dunlap and Ember as separate entities for the purpose of punitive damages while elsewhere in the verdict form the other questions assumed that liability could be found for both Dunlap and Ember based on the acts of either (e.g., Question No. 5: "Did Ember Entertainment *or* Lindsay Dunlap fail to do something that the written agreement required either one to do?").

Dunlap's complaint is not well taken. Because the court found that Ember was the alter ego of Dunlap – a finding which Dunlap does not challenge on appeal – it does not matter whether Dunlap and Ember were listed separately in questions or assumed to be responsible for each other's acts. Under either construction of questions, Dunlap was ultimately responsible for her individual acts and the acts of her alter ego, Ember. Thus

8       Question 23 provides: "Did Anchor Bay Entertainment prove, by clear and convincing evidence that any of the Defendants acted with malice, oppression or fraud? Answer (check 'Yes' or 'No') following the name of each Defendant: Lindsay Dunlap[;] Ember Entertainment, Inc."

13

any ambiguity or confusion in question 23 or the other questions where Ember and Dunlap's actions are posed with the conjunctive "or" is harmless. It is not reasonably likely that absent the purported ambiguity in these questions Dunlap would have obtained a better result in the trial. (See *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 801-802 [harmless error standard of *People v. Watson* (1956) 46 Cal.2d 818 applies to civil cases].)

Dunlap further complains that question No. 24[9] in the special verdict is biased and conclusory because "it presumes that there are damages and does not present the possibility that there are no damages." However, Dunlap did not object to the question in the trial court. This is exactly the type of error that could have been remedied at the drafting stage or clarified after the jury returned the verdict. Any bias or presumption in the question could have been corrected by including the additional language Dunlap proposes in her opening brief: "What are the damages, if any . . . ." Because the special verdict was jointly prepared by the parties,[10] and because defect could have been cured below, we will not consider Dunlap's complaint on appeal. (See *Mardirossian & Associates, Inc. v. Ersoff* (2007) 153 Cal.App.4th 257, 276-277 [refusing to consider a complaint that the questions in the special verdict omitted information when the complaint was not first raised in the trial court]; *Thompson Pacific Construction, Inc. v. City of Sunnyvale* (2007) 155 Cal.App.4th 525, 550 [finding that cross-defendant waived any complaint that jury was not asked to determine an element of one of the claims when no objection on that basis was made in the trial court]; see *Jones v. Wagner* (2001) 90 Cal.App.4th 466, 481 ["'[A]s a general rule issues not raised in the trial court cannot be raised for the first time on appeal.'"]; see also *Lynch v. Birdwell* (1955) 44 Cal.2d 839,

---

9     Question 24 provides: "What are Anchor Bay Entertainment, Inc.'s damages attributable to Lindsay Dunlap or Ember Entertainment, Inc.'s fraud? Money paid out of pocket  $_____[;] Lost Profits $_____[;] Post Production Costs $_____."

10     We recognize that Dunlap chose to act as her own legal counsel during the trial. However, her status as a self-represented litigant does not excuse her from asserting proper arguments or making appropriate and timely objections. "Pro. per. litigants are held to the same standards as attorneys." (*Kobayashi v. Superior Court* (2009) 175 Cal.App.4th 536, 543.)

14

851 [where defendants did not object at trial to error in verdict form, "it appears to be the settled rule that they have waived their right to complain as to its form"]; *Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 131 ["BMW waived any objection to the special verdict form by failing to object before the court discharged the jury"].)

In any event, as written the instruction is neither inconsistent with other instructions nor hopelessly ambiguous, and thus we interpret it in light of the pleadings, evidence, and instructions. In the jury instructions the jury was informed that Starz had to prove damages as an affirmative element of the fraud claim. Starz presented evidence of damages – out of pocket expenses, production costs and lost profits – it sustained as a result of Dunlap's fraud. The jury was also told that it was to follow the instructions on the law to answer the questions in the special verdict. We assume that the jury followed those instructions and therefore must have found that Starz proved its fraud damages otherwise the jury would have entered a zero for each of the categories of damages listed in question 24.

> 2. *Challenges to Question Nos. 1-16 in the Special Verdict*
> *Relating to the Causes of Action for breach of contract,*
> *Negligent misrepresentation and intentional misrepresentation.*

Dunlap argues that the questions in the special verdict relating to the breach of contract claims are defective because they omit the element of causation. She asserts that the questions relating to negligent misrepresentation claims cannot support the judgment because the verdict failed to require the jury to determine whether Starz' reliance on Dunlap's representations was justified or reasonable. Finally, with respect to the intentional misrepresentation claims, Dunlap complains that the questions assumed the element of reliance and also failed to require a determination on the issue of whether the reliance was justified. She also complains that some of the questions relating to these three causes of action were confusing, out of logical sequence and/or assumed that Starz had suffered damage.

We do not reach the merits of any of Dunlap's arguments relating to questions 1-16 in the special verdict pertaining to the causes of action for breach of contract,

15

negligent misrepresentation and intentional misrepresentation. Even were we to assume that she preserved these claims for appeal and that they are meritorious, any errors asserted are harmless. Other than her complaint relating to the issue of fraud damages in question 24 which we have rejected elsewhere, *infra*, at this point Dunlap does not argue that questions pertaining to the fraud cause of action omit elements of the claim. Consequently, because the amount of compensatory damages awarded on *all* four causes is the same, the findings on fraud are sufficient standing alone to support the judgment for compensatory damages without reference to the other causes of action. Thus, it is not reasonably probable that in the absence of any errors in questions 1-16 in the special verdict, a different result would have been reached in the trial court.

In view of all of the foregoing, we conclude that Dunlap's complaints concerning the special verdict do not warrant reversal.

## III. Sufficient Evidence Does Not Support the Award of Punitive Damages.

Dunlap contends the evidence presented during the trial was insufficient to support the jury's award of $1.4 million in punitive damages against her.[11] As we shall explain, we agree.

### A. *Governing Law*

"In a civil case not arising from the breach of a contractual obligation, the jury may award punitive damages 'where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice.' (Civ.Code, § 3294, subd. (a).)" (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 712.) In reviewing a challenge to

---

[11] Starz suggests that Dunlap waived her arguments regarding the punitive award by failing to move for a new trial in the trial court. We reject this argument. (See *Adams v. Murakami* (1991) 54 Cal.3d 105, 115, fn. 5 [court has discretion to decide punitive damages issue because the public interest in the award cannot "be thwarted by a defendant's oversight or trial tactics"]; *Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1282 [evidence of a defendant's financial condition "is a requirement imposed as a matter of public policy and hence not subject to waiver by the failure of an inattentive defendant to object or otherwise call attention to the inadequacy of plaintiff's proof"].)

16

an award of punitive damages, courts traditionally "determine whether the award is excessive as a matter of law or raises a presumption that it is the product of passion or prejudice." (*Adams v. Murakami, supra,* 54 Cal.3d at pp. 109-110.) To make this determination, courts consider three factors: (1) the degree of reprehensibility of the defendant's conduct; (2) the amount of compensatory damages awarded; and (3) the defendant's financial condition or wealth. (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928; *Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 690, fn. 18.)

Dunlap does not raise any issue on appeal with respect to the evidence of her conduct or the relationship between the compensatory damages and the award of punitive damages. She challenges only the evidentiary showing regarding their financial condition.

"We review the trial court's award of punitive damages for substantial evidence." (*Baxter v. Peterson* (2007) 150 Cal.App.4th 673, 679.) A punitive damages award cannot be sustained absent meaningful evidence of the defendant's financial condition. (*Adams v. Murakami, supra,* 54 Cal.3d at p. 109; *Baxter v. Peterson* (2007) 150 Cal.App.4th 673, 680.) Indeed, "[b]ecause the important question is whether the punitive damages will have the deterrent effect without being excessive, an award that is reasonable in light of the first two factors, reprehensibility of the defendant's conduct and injury to the victims, may nevertheless 'be so disproportionate to the defendant's ability to pay that the award is excessive' for that reason alone. [Citation.]" (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 620.) The plaintiff has the burden of presenting evidence and the burden of proof regarding the defendant's financial condition. (*Adams v. Murakami*, *supra,* 54 Cal.3d at p. 123; *Bankhead v. ArvinMeritor, Inc.* (2012) 205 Cal.App.4th 68, 83, fn. 9.)

The evaluation of a defendant's financial condition must be considered in light of the purposes of punitive damages: to punish the defendant and deter the commission of wrongful acts. (*Neal v. Farmers Ins. Exchange, supra*, 21 Cal.3d at p. 928, fn. 13.) These policies are not served if the defendant's wealth allows him to absorb the award with little or no discomfort. (*Id.* at p. 928.) The "'wealthier the wrongdoing defendant, the

17

larger the award of exemplary damages need be in order to accomplish the statutory objective.' [Citation.]" (*Adams v. Murakami*, *supra,* 54 Cal.3d at p. 110.) Conversely, "'the function of punitive damages is not served by an award which, in light of the defendant's wealth and the gravity of the particular act, exceeds the level necessary to properly punish and deter.'" (*Ibid.;* see also *Rufo v. Simpson, supra,* 86 Cal.App.4th at p. 620.) Indeed, "[t]he purpose is to deter, not to destroy." (*Adams v. Murakami*, *supra,* 54 Cal.3d at p. 112.)

There is no established method or standard for determining a defendant's financial condition when evaluating an award of punitive damages. (*Bankhead v. ArvinMeritor, Inc., supra,* 205 Cal.App.4th at p. 79.) Although the defendant's net worth is commonly used in assessing punitive damages, it is not the exclusive measure. (*Rufo v. Simpson, supra*, 86 Cal.App.4th at p. 621.) Standing alone, neither net worth, nor assets, nor income is sufficient to support punitive damages. (See *Zaxis Wireless Communications, Inc. v. Motor Sound Corp.* (2001) 89 Cal.App.4th 577, 582 [net worth too easily manipulated to be the sole standard for ability to pay]; *Lara v. Cadag* (1993) 13 Cal.App.4th 1061, 1065 [evidence of earnings is not by itself sufficient].) Moreover, absent other measures of ability to pay, evidence of profits wrongfully obtained by the defendant is also inadequate. (*Robert L. Cloud & Associates, Inc. v. Mikesell* (1999) 69 Cal.App.4th 1141, 1152.) To obtain a meaningful understanding of the defendant's wealth, evidence of liabilities should normally "accompany evidence of assets, and evidence of expenses should accompany evidence of income." (*Baxter v. Peterson, supra,* 150 Cal.App.4th at p. 680; see also *Kenly v. Ukegawa* (1993) 16 Cal.App.4th 49, 57.) Ultimately, "'[w]hat is required is evidence of the defendant's ability to pay the damage award.'" (*Baxter v. Peterson, supra,* 150 Cal.App.4th at p. 680; see also *Adams v. Murakami, supra,* 54 Cal.3d at p. 112.) In addition, the defendant's wealth is to be measured as of the time of the trial on punitive damages. (*Washington v. Farlice* (1991) 1 Cal.App.4th 766, 777; *Zhadan v. Downtown Los Angeles Motor Distributors, Inc.* (1979) 100 Cal.App.3d 821, 839.)

B.    *Analysis of Punitive Damages Award Against Dunlap*

18

On appeal Starz argues that it presented sufficient evidence to support the award of punitive damages. Starz points out that it had paid Dunlap/Ember $625,000 under the contract between November 2005 and February 2006. It also cites evidence that Dunlap purchased a home in Malibu in 2004 for $3 million and owned another home in Pacific Palisades which she purchased for over $1 million.[12] At some point in the mid-2000s, Dunlap took out a home equity line of credit on the Malibu home for two increments of $1.3 million each, and she lent those funds to Ember. Dunlap testified that Ember still owed her about $1.3 million. Starz presented evidence that between 2007 and 2010 an investor lent Dunlap about $300,000 for the UNCLE television series project. Other evidence was presented that Dunlap signed checks on Ember accounts for expenses related to her house, including payments on the home equity loans, housekeeping, utilities, groceries, personal entertainment and credit cards. Dunlap testified that she drove a 2003 jaguar with 80,000 miles on the odometer. In addition, when Dunlap was the president of Ember she had received cashier's checks from Ember in the amount $25,000 and $26,099.70. Starz also presented evidence that during trial Dunlap had in her possession a check (written on an Ember account) for $20,000 in her possession, which Dunlap said was to be used to pay attorney fees.

During closing argument, Starz' counsel asked the jury to award $2 million in punitive damages against Dunlap because "she has a multimillion dollar house in Malibu. She's owed millions of dollars. She drives a Jaguar. She's indicated that she 'hobnobs' with Steven Spielberg and James Cameron."

In our view, Starz did not carry its burden to prove Dunlap's financial condition during the trial. The evidence in the record is insufficient to demonstrate Dunlap's overall ability to pay the punitive damage award. Although the substantial evidence standard is deferential to the fact finder, "this does not mean we must blindly seize any evidence in support of the respondent in order to affirm the judgment. . . . '[I]f the word

_____

[12] The record does not disclose the date Dunlap purchased the home in Pacific Palisades, its exact purchase price or whether she owned it at the time of trial.

19

"substantial" [is to mean] anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with "any" evidence. It must be reasonable . . . , credible, and of solid value . . . .' [Citation.]" (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633.)

There are several problems with Starz' evidence of Dunlap's financial condition. Preliminarily, the evidence was superficial and of limited relevance to the punitive damage determination. The evidence Starz cites on appeal to prove Dunlap's financial ability to pay a punitive damage award was presented during the trial in the context of proving that Ember was Dunlap's alter ego—that over the years Dunlap used Ember (and its accounts) as her personal bank account to pay her expenses and finance her lifestyle. For example, Starz presented evidence that Dunlap borrowed money from the equity in her home and placed it in Ember's account and wrote checks to herself on Ember's account. Starz also presented evidence that Dunlap wrote checks on Ember's accounts for such items as remodeling projects at her home in Malibu, housekeeping and her entertainment expenses. While this evidence clearly showed that Dunlap directed the transfer of money out of Ember's accounts, it has minimal probative value to the issue of Dunlap's overall financial condition.

In addition, the evidence elicited at trial provided only a limited picture of Dunlap's assets, and revealed almost nothing about her liabilities. The evidence Starz cites does not show Dunlap's *current* financial condition as of the time of trial. The trial took place in March 2010. Most of the evidence Starz presented concerning Dunlap's financial condition was several years old, dating to the 2003-2007 time period (i.e., at some point in the mid-2000s she represented in a loan application that she was earning $100,000 a month). According to Dunlap she was no longer employed by Ember, having left the company in 2008. Dunlap testified that she had no money of her own at the time of trial. There was no evidence presented concerning Dunlap's *current* income. Also there was no evidence of the current value of her homes, car, or her other current assets or expenses. Starz did not present evidence of any other current liabilities or any indebtedness (or current equity) attached to either of Dunlap's homes. (*Kelly v. Haag*

20

(2006) 145 Cal.App.4th 916, 917 [even if defendant currently owned properties, absence of evidence of encumbrances or other liabilities on them defeats punitive damages award].) Moreover, other than Dunlap's claim that Ember still owed her $1.3 million, there was no evidence as to whether she could or would ever collect those funds from Ember. The record is also unclear as to the status of the funds that had been lent to Dunlap by the investor for the UNCLE television project between 2007 and 2010.

We note that Starz presented evidence that it had given Dunlap $625,000 under the contract at issue in the case, but those funds (assuming that they were still available to Dunlap in 2010) standing alone cannot support the jury's punitive damage award. (See *Kenly v. Ukegawa, supra*, 16 Cal.App.4th 49, 56, [holding that a punitive damages award could not be made "solely on the basis of proof of the profit reaped by a defendant as the result of the fraud"].)

In short, even viewing the record in the light most favorable to the judgment, there was insufficient evidence from which the trier of fact—or this court on appeal— could determine whether Dunlap would be able to pay the award of $1.4 million in punitive damages at the time of trial. (See, e.g., *Baxter v. Peterson, supra,* 150 Cal.App.4th 673, 681 ["In sum, although the record shows that [defendant] owns substantial assets, it is silent with respect to her liabilities. The record is thus insufficient for a reviewing court to evaluate [defendant's] ability to pay $75,000 in punitive damages."]; *Kelly v. Haag, supra,* 145 Cal.App.4th at p. 917 ["[W]ithout any evidence [defendant] still held the assets, or of the amounts of his liabilities, the $75,000 award is unsupported by substantial evidence and excessive."].) "Without such evidence, a reviewing court can only speculate as to whether the award is appropriate or excessive." (*Adams v. Murakami, supra*, 54 Cal.3d at p. 112.)

Finally, because our reversal is based solely on insufficiency of the evidence, we conclude that we must strike the punitive damages award from the judgment, and that no retrial of the punitive damages issue is warranted. "'When the plaintiff has had full and fair opportunity to present the case, and the evidence is insufficient as a matter of law to support plaintiff's cause of action, a judgment for defendant is required and no new trial

21

is ordinarily allowed, save for newly discovered evidence. . . . Certainly, where the plaintiff's evidence is insufficient as a matter of law to support a judgment for plaintiff, a reversal with directions to enter judgment for the defendant is proper. . . . [¶] . . . [A] reversal of a judgment for the plaintiff based on insufficiency of the evidence should place the parties, at most, in the position they were in after all the evidence was in and both sides had rested.' (*McCoy v. Hearst Corp.* (1991) 227 Cal.App.3d 1657, 1661; accord, *Bank of America v. Superior Court* (1990) 220 Cal.App.3d 613, 626-627.) In another context, our Supreme Court explained in *Silberg v. Anderson* (1990) 50 Cal.3d 205, 214, that '[f]or our justice system to function, it is necessary that litigants assume responsibility for the complete litigation of their cause during the proceedings.'" (*Kelly v. Haag, supra,* 145 Cal.App.4th at p. 919.)

Here, as in *Baxter v. Peterson, supra,* 150 Cal.App.4th at page 681, Starz had "'a full and fair opportunity to present [its] case for punitive damages, and [Starz] does not contend otherwise.' (*Kelly v. Haag*, *supra*, 145 Cal.App.4th at p. 919.) When a punitive damage award is reversed based on the insufficiency of the evidence, no retrial of the issue is required." Likewise in *Robert L. Cloud & Associates, Inc. v. Mikesell, supra,* 69 Cal.App.4th at page 1154, the court reversed a punitive damages award because there was no evidence of the defendant's financial condition, and it did not remand for retrial. In view of this case law, we reverse the punitive damages from the judgment without ordering retrial.

### *DISPOSITION*

The judgment is reversed insofar as the punitive damages award is concerned. In all other respects, the judgment is affirmed. Each party is to bear its own costs on appeal.

22

                                         **WOODS, Acting P. J.**

**I concur:**

        **JACKSON, J.**

**ZELON, J., Dissenting:**

I respectfully dissent.

In this case, plaintiff Starz drafted and presented to defendant Ember an integrated license agreement. That agreement, entered by Starz and Ember, through Dunlap, was not limited to California, but covered a broad territory which included the United States, Canada, and US military installations around the world. The language put forward by Starz, and accepted by Ember, expressly provided: "any and all disputes arising hereunder or related hereto shall be construed under the laws of the State of New York applicable to agreements to be wholly performed therein. Licensor and Licensee consent to exclusive jurisdiction of the state and federal courts sitting in the State of New York over any and all matters arising under or related to this Agreement."

Although months of proceedings in this case involving service of process and the entry of, and relief from, defaults preceded the motion to enforce this mandatory forum selection clause, Ember had not been served until shortly before the motion was filed; the motion was its first responsive pleading. Starz opposed the motion, claiming, among other grounds, that Ember was in default at the time of filing and did not have the capacity to seek the relief; that Dunlap was not a party to the agreement and thus could not enforce it; and that enforcement would be unfair, unreasonable, and unconscionable. Included in its opposition was a footnote which read "Starz suspects that "New York" was inadvertently inserted via a form contract template." No evidence was cited in support of that posited suspicion, nor did any of the declarations or documents attached to the opposition provide any evidence of the suspected inadvertence. There was no indication that Starz had ever informed Dunlap or Ember, prior to this dispute, that it believed this provision of the contract was inserted in error. Starz, as a result, failed to provide the defendants any opportunity to assert their intent in accepting this provision of the agreement.

At the hearing on December 8, 2008, the trial court expressed concern that Starz, as the contract's drafter, was opposing the enforcement of the very provisions it had drafted. In response, counsel for Starz argued that the footnote "set forth that it was a mistake that it was put in. It was a holdover from another contract." This statement, presumably inadvertent, mischaracterized the footnote; in any event, it was made without any evidentiary basis. The court nonetheless appeared to accept this explanation. The remainder of the hearing addressed the reasonableness of enforcing the clause in light of the location of the parties and witnesses. The court stated that it was denying the motion on reasonableness grounds.

**California Law Favors Enforcement of Forum Selection Clauses**

"Both the United States Supreme Court and the California Supreme Court have recognized that '[f]orum selection clauses play an important role in both national and interstate commerce.'" (*Net2Phone, Inc. v. Superior Court* (2003) 109 Cal.App.4th 583, 587-588 (*Net2Phone*); citing *M/S Bremen v. Zapata Off-Shore Co.* (1972) 407 U.S. 1, 10 [92 S.Ct. 1907, 32 L.Ed.2d 513]; *Smith, Valentino & Smith, Inc. v. Superior Court* (1976) 17 Cal.3d 491, 496.) "Such clauses provide a degree of certainty, both for businesses and their customers, that contractual disputes will be resolved in a particular forum. [Citation.] California courts routinely enforce forum selection clauses even where the chosen forum is far from the plaintiff's residence. (See, e.g., *Intershop Communications AG v. Superior Court* (2002) 104 Cal.App.4th 191, 196-202 [Hamburg, Germany, forum]; *CQL Original Products, Inc. v. National Hockey League Players' Assn.* (1995) 39 Cal.App.4th 1347, 1355-1356 [Ontario, Canada, forum].)" (*Net2Phone*, at pp. 587-588; see *Schlessinger v. Holland America* (2004) 120 Cal.App.4th 552, 558 ["[b]oth California and federal law presume a contractual forum selection clause is valid and place the burden on the party seeking to overturn the forum selection clause"].) When a forum selection clause has been "entered into freely and voluntarily by parties who have negotiated at arm's length," the clause will be enforced "in the absence of a showing that enforcement of such a clause would be unreasonable." (*Smith, Valentino & Smith, Inc. v.*

2

*Superior Court*, *supra*, 17 Cal.3d at p. 496.) In those circumstances, the party seeking to avoid application of the forum selection clause bears a "substantial burden" to prove unreasonableness. (*CQL Original Products, Inc. v. National Hockey League Players' Assn., supra,* 39 Cal.App.4th at p. 1354; *Net2Phone, supra*, 109 Cal.App.4th at p. 588.)[1]

The trial court's determination whether enforcement of a forum selection clause is reasonable is generally reviewed for abuse of discretion. (*Net2Phone, supra*, 109 Cal.App.4th at p. 588; *America Online, Inc. v. Superior Court* (2001) 90 Cal.App.4th 1, pp. 7-9; but see *Cal-State Business Products & Services, Inc. v. Ricoh* (1993) 12 Cal.App.4th 1666, 1680 [applying substantial evidence standard of review].)

**The Record Does Not Provide a Basis For the Ruling**

This record is silent as to any legal or evidentiary basis for the trial court's exercise of discretion. The substantial burden on Starz, as the party seeking to avoid enforcement of the forum selection it had made, was to provide evidence "to demonstrate that the contractually selected forum would be unavailable or unable to accomplish substantial justice or that no rational basis exists for the choice of forum." (*Intershop Communications AG v. Superior Court* (2002) 104 Cal.App.4th 191, 199.)

Starz provided neither evidence, nor argument, that New York is not available as a forum. Starz also failed to provide any evidence that the courts in New York would be unable to accomplish substantial justice. Instead Starz only asserted, but did not demonstrate, that the clause was a mistake, and argued that its enforcement would be unreasonable, in that the disputed payment was made in California, the witnesses are located in California, and that none of the parties do business in New York. The court

---

[1] As the parties agreed that New York law was to be applied, I note that New York appears to follow the same rule: that a forum selection clause will be given effect absent a showing that it is unfair or unreasonable, and thus no different standard need be considered in this case. See *Cal-State Business Products & Services, Inc. v. Ricoh*, *supra*, 12 Cal.App.4th at p. 1678, fn. 11.

relied on the fact that the parties had no New York connection, and that it believed Dunlap's health would make proceeding in New York difficult.[2]

As to the first factor, Starz made no showing that the asserted lack of current contacts to New York made the choice of a New York court to apply New York law to the dispute unreasonable. No party has asserted that the choice of law should not, or cannot, be enforced. Nor was any evidence presented to overcome Dunlap and Ember's presumed intent, in entering the agreement requiring the application of New York law, to obtain the benefits of the enforcement of New York law in any disputes between the parties. Accordingly, that connection to New York is undisputed.

The second factor also cannot support the ruling. This is purely a matter of inconvenience to the defendants in the case. However, "neither inconvenience nor additional expense in litigating in the selected forum is part of the test of unreasonability." (*Cal-State Business Products & Services, Inc. v. Ricoh* (1993) 12 Cal.App.4th 1666, 1679.) In any event, the parties who would be inconvenienced most are the parties seeking to enforce the clause, who were presumably able to weigh that factor against the benefit of the agreed to forum.

In sum, I do not believe that Starz met its burden of establishing a basis for the trial court to ignore the mutually agreed to contractual provision mandating that this dispute be resolved by a New York court applying New York law. I would reverse.

**ZELON, J.**

---

[2]     The court did not rule that the choice of law provision, mandating the application of New York law to the controversy, was unenforceable. Hence these proceedings will be governed by New York law.