AMERICAN STUDENT FINANCIAL GROUP, INC., a Delaware Corporation, Plaintiff,

v.

DADE MEDICAL COLLEGE, INC., a Florida Corporation; University of Southernmost Florida, Inc., a Florida Corporation; Ernesto A. Perez; Chris J. Gressett; and Does 1 through 20, Defendants.

Case No.: 15cv367 JLS (JLB)

United States District Court, S.D. California.

Signed October 9, 2015

Alan Vanderhoff, Vanderhoff Law Group, San Diego, CA, for Plaintiff.

Lisa S. Yun, Mark G. Rackers, Shannon Z. Petersen, Sheppard Mullin Richter & Hampton, LLP, San Diego, CA, for Defendants.

**ORDER GRANTING PLAINTIFF ASFG'S MOTION FOR SUMMARY JUDGMENT WITH REGARD TO THE FIRST AND SECOND CAUSES OF ACTION**

Hon. Janis L. Sammartino, United States District Judge

Presently before the Court is plaintiff American Student Financial Group, Inc.'s

1. For ease of reference, page citations to docketed materials refer to the CM/ECF page

(ASFG) Motion for Summary Judgment With Regard to the First and Second Causes of Action or, in the Alternative, Summary Adjudication of Facts. (Mot., ECF No. 31.) Also before the Court is defendant Dade Medical College, Inc.'s (Dade) Opposition to Motion for Summary Judgment With Regard to the First and Second Causes of Action or, in the Alternative Summary Adjudication (Opposition), (ECF No. 35), and ASFG's Reply to Dade's Opposition to Motion for Summary Judgment With Regard to the First and Second Causes of Action (Reply), (ECF No. 36).

## BACKGROUND

Plaintiff ASFG buys student loans for investment purposes. (Mot., ECF No. 31-1, at 4).[1] It is incorporated in Delaware with its principal place of business in Solana Beach. (Def.'s Resp. to Pl.'s Statement of Undisputed Facts, ECF No. 35-3, at 2 [hereinafter "Def. UMF"].) ASFG filed this breach of contract action on February 2, 2015, naming as defendants Dade Medical College, Inc., a Florida corporation with its principal place of business in Coral Gables, Florida; University of Southernmost Florida (USMF), a Florida corporation with its principal place of business in Coral Gables, Florida; Ernesto A. Perez, the sole shareholder of both Dade and USMF and a citizen of Florida; Chris J. Gressett, the chief financial officer of Dade and USMF and a citizen of Florida; and twenty DOE defendants. (Compl., ECF No. 1.) ASFG moved for summary judgment on its first and second causes of action, which pertain only to Dade.

Dade is a private post-secondary school with more than 1,600 students, offering

number.

**674**

associate and bachelor's degrees in health-care related programs. (Opp'n, ECF No. 35, at 5.)

ASFG buys loans made directly by private post-secondary schools to their students and private loans made by banks to students. (Mot., ECF No. 31-1, at 4.) In both kinds of transactions, ASFG secures from the school receiving the students' tuition payments a recourse guarantee for the loans ASFG owns. (*Id.*) The recourse guarantees require schools to buy from ASFG the loans that become delinquent or, in cases where a large number of loans are delinquent, to purchase all of the loans covered by that particular agreement. (*Id.*)

ASFG and Dade have two such agreements. (*Id.*) The first is the Tuition Loan Program Agreement (TLPA). (*Id.* at 5.) The second is the Educational Account Portfolio Purchase and Sale Agreement (Account Purchase Agreement). (*Id.*) In both cases, an entity other than ASFG issued the student loans and then sold them to ASFG. (Opp'n, ECF No. 35, at 5.)

**I. The TLPA**

ASFG and Dade entered into the TLPA in December 2013. (Mot., ECF No. 31-1, at 5.) Under the agreement, ASFG bought certain loans issued to Dade students by third party Bank of Lake Mills, and Dade was required to pay ASFG certain fees and purchase loans that were more than 90 days delinquent. (*Id.*) The loans involved in the TLPA were "gap loans," which students can use to cover the difference between tuition and the maximum loan amounts offered by the federal government as subsidized loans. (Opp'n, ECF No. 35, at 8.)

ASFG secured the TLPA deal with collateral using a third party, Cottingham Apex Fund, LLC. (Opp'n, ECF No. 35, at 9.) For every dollar that Bank of Lake Mills loaned to Dade students, Dade would

"loan" Cottingham forty-five cents. (*Id.* at 9; ECF No. 36-2, at 4-5.) Cottingham signed a promissory note (the Cottingham Note) in which Cottingham agreed to pay Dade regular interest on the loans from Dade to Cottingham. (Opp'n, ECF No. 35, at 9.) Dade assigned the Cottingham Note to ASFG as security for the deal. (*Id.*)

Section 11 of the TLPA sets out the terms requiring Dade to obtain the Cottingham Note:

> As consideration for the obligations to be undertaken and performed by ASFG under this agreement, which [Dade] acknowledges to be of significant value to [Dade], [Dade] hereby pledges, grants, and assigns to ASFG a continuing security interest in, a lien on, and a pledge and assignment of the Collateral .... The security interest granted hereunder is given to and shall be held by ASFG for the sole <u>purpose of providing security for the full satisfaction and performance</u> of all "[Dade's] Obligations" ... arising under this Agreement.

(TLPA § 11.1, ECF No. 31-4, at 14 (emphasis added).) The contract defined Dade's Obligations as "all debts, liabilities, obligations, covenants, and duties owing by [Dade] to ASFG arising under this Agreement ...." (TLPA § 11.1.1, ECF No. 31-4 at 15.)

Beginning in December 2014, Dade did not pay fees it was obligated to pay to ASFG. (Mot., ECF No. 31-1, at 8; Opp'n, ECF No. 35, at 9; *see also* Def. UMF, ECF No. 35-3, at 3-4, 9.) When Dade did not pay, ASFG declared a "Program Default" and required Dade to purchase all of the loans covered by the TLPA. (Mot., ECF No. 31-1, at 5.)

Dade owed ASFG a $25,000 program fee on December 1, 2014; January 1, 2015; February 1, 2015; and March 1, 2015, but failed to pay in each instance. (Mot., ECF

No. 31-1, at 5.) Dade admits that it breached the TLPA by failing to pay the program fees. (Def. UMF, No. 26, ECF No. 35-3, at 9.) Dade also admits that it did not pay a "Minimum Volume Fee" of $185,771, which became due on February 27, 2015. (Def. UMF, No. 27, ECF No. 35-3, at 9.)

ASFG sent Dade a letter on December 18, 2014, stating that ASFG was enforcing its right to require Dade to purchase certain loans specified in the letter. (Def. UMF, Nos. 29–32, ECF No. 35-3, at 10-11.) Those loans added up to $3,966,855.48, which ASFG notified Dade was due on January 23, 2015. (Id.) Dade never paid. (Id.)

ASFG alleges that, as of September 15, 2015, Dade owed a total principal amount of $4,270,682.58,[2] (Rep., Ex. M, ECF No. 36-3, at 6), plus interest at a rate of 8% per year. (Mot., No. 31–1, at 10.) ASFG argues that failure to pay the Program Fees, the Minimum Volume Fee, and the price of the loans is a material breach of the TLPA, entitling it to that sum plus attorneys' fees.

Dade does not dispute the fact that it did not pay these fees, or that the TLPA provided for them. Instead, Dade argues, first, that ASFG did not perform all of its obligations under the TLPA or performed in bad faith, and, second, that ASFG cannot establish that it suffered the amount of damages it claims. (Opp'n, ECF No. 35, at 13, 16.)

## A. *Good Faith Performance*

First, Dade argues that the TLPA included an implied covenant of good faith and fair dealing, and that ASFG breached that covenant because it did not ensure that the servicer it hired properly mitigated damages from defaults on student loans. (Id. at 13-14.) Dade says it expected proper loan servicing—which was performed by third parties hired by ASFG—because Dade bore the risk if loans defaulted. (Id. at 14.) Dade believed that ASFG would instruct its servicers to "creatively work with struggling borrowers to find ways for them to stay current on their loans" and would "employ a due diligence schedule to contact borrowers who were in default." (Gressett Decl., ¶ 3, ECF No. 35-2, at 3.) Dade does not, however, point to any particular provision of the TLPA that requires these sorts of efforts to accommodate borrowers.

ASFG stated that it believed Bank of Lake Mills, which issued the loans in the first place, did not allow for these accommodations, but that ASFG later—importantly, after it had declared the Program Default—determined that was incorrect and changed its policy to allow students to make interest-only payments. (Pl.'s Reply to Def.'s Separate Statement of Additional Undisputed Facts, Nos. 76–77, ECF No. 36-2, at 3-4 [*hereinafter* "Pl. UMF Rep."].) The timing of the policy change, Dade argues, raises a genuine dispute of fact as to whether ASFG was setting its policies in an attempt to increase the default rate on TLPA loans and, therefore, performed in bad faith.

ASFG used University Accounting Service, LLP (UAS) to service its loans. (Opp'n, ECF No. 35, at 5.) Dade points to the interaction between ASFG and UAS to further suggest the possibility of bad faith on ASFG's part. In particular, ASFG and UAS agreed upon a due diligence schedule that set out the number and frequency of communications in which UAS would engage with borrowers who were late on their loans. (Id. at 15.) UAS charges ASFG

---

2. ASFG arrives at this number by adding fixed and variable "Monthly Program Fees," a "Load in Fee," the "Designated Loan Purchase Price," and the "Minimum Volume Fee." (Rep., Ex. M, ECF No. 36-3, at 6.)

for the correspondence with borrowers, so ASFG stood to both save money and increase the default rate by decreasing communications with borrowers. (*Id.*) ASFG instructed UAS to stop making due diligence calls in February 2015. (Pl. UMF Rep., No. 75, ECF No. 36-2, at 2-3.) ASFG clarifies that it gave this instruction to UAS for ASFG's entire loan portfolio, not just loans tied to Dade students,[3] and that the instruction came several months after ASFG had already declared the Program Default. (*Id.*)

### B. *Damages*

Second, Dade argues that a genuine dispute of fact exists with regard to the amount of damages Dade owes ASFG, and to a lesser degree, whether Dade owes ASFG anything at all. (Opp'n, ECF No. 35, at 16.)

ASFG perfected its security interest in the Cottingham Note by filing a UCC financing statement with the Secretary of State of California. (Def. UMF, No. 34, ECF No. 35-3, at 12.) Dade argues the Cottingham Note—the collateral for the TLPA—may amount to "full satisfaction" of Dade's liability under the TLPA, such that ASFG would be entitled to no other damages on that breach of contract claim, or at least that Dade should be entitled to an offset. (Opp'n, ECF No. 35, at 17.)

Dade estimates the Cottingham Note is worth $1.9 million. (*Id.*)

ASFG does not actually own the Cottingham Note, but instead has a lien on it. (Rep., ECF No. 36, at 2.) Dade still owns the Cottingham Note, and ASFG may elect to foreclose on the note in a UCC sale. (*Id.*) ASFG acknowledges that the proceeds from such a sale would in fact be credited toward damages owed under the TLPA.[4] (*Id.* at 9 ("[T]o the extent that ASFG receives payments under the Cottingham Note after this Court enters a judgment in ASFG's favor, those payments will be applied to partially satisfy the judgment.").)

## II. The Account Purchase Agreement

ASFG's second cause of action is for breach of the Account Purchase Agreement contract. A firm called JLB Capital Management (JLB) in December 2013 entered into the Account Purchase Agreement with Dade, buying from Dade a series of student loans related to Dade students and other accounts. (Mot., ECF 31-1, at 5-6.) ASFG acquired these accounts from JLB in February 2014, and became the successor to the Purchase Agreement so that the Purchase Agreement was effectively between Dade and ASFG. (Opp'n, ECF 35, at 10.)

---

3. ASFG says:

> The reason for suspending the telephone calls was related to the fact that certain for profit universities had been sued by the attorneys general of certain states and by the federal Consumer Financial Protection Bureau for violating debt collection laws. That story was trending in the new[s] media at that time. The due diligence telephone calls were suspended temporarily out of an abundance of caution and so as not to unduly upset student borrowers during that sensitive time.

(Rep., ECF No. 36, at 5-6.)

4. The Cottingham Note as a financial instrument for which the "principal amount of a promissory note is not the same as the value of a promissory note." (Pl. UMF Rep., No. 80, ECF No. 36-2, at 5.) Rather, the value of the note is the amount someone is willing to pay for it in "a sale of the note to a third party." (*Id.*) The Cottingham Note gave Dade the right to receive interest payments from the money it paid to Cottingham. ASFG directed Cottingham to make future payments to itself. (Rep., ECF No. 36, at 2.) ASFG says its damages worksheet accounts for payments received from the Cottingham Note fund. (Rep., ECF No. 36, at 9.)

In December 2014, ASFG sent a letter to Dade exercising its contractual right to require Dade to purchase 24 defaulted accounts covered by the Account Purchase Agreement. (Mot., ECF No. 31-1, at 6.) In January 2015—the next month—ASFG sent Dade a letter declaring "institutional default," exercising its contractual right to require Dade to buy all of the accounts covered by the Account Purchase Agreement, totaling $369,690.72. (*Id.* at 6.)

As with its response to the TLPA, Dade argues, first, that ASFG did not perform all of its obligations under the Account Purchase Agreement or performed in bad faith, and, second, that ASFG cannot establish that it suffered the amount of damages it claims, in particular because Dade has already paid for some of its obligations under the Account Purchase Agreement. (Opp'n, ECF 35, at 13, 16.)

### A. *Good Faith Performance*

First, Dade's argument regarding ASFG's performance of the Account Purchase Agreement is largely the same as under the TLPA. Dade contends there is a triable issue of fact as to whether ASFG performed its obligations under the Account Purchase Agreement in good faith because it instructed UAS to stop due diligence in February 2015. Additionally, the Account Purchase Agreement required Dade to pay $375 to ASFG for each defaulted loan to "defray the costs to be incurred by [ASFG] for enhanced servicing and default avoidance services." (Pl. UMF Rep., No. 86, ECF No. 36-2, at 7-8.)

### B. *Damages*

The Cottingham Note is not connected to the Account Purchase Agreement. (*See* Opp'n, ECF No. 35, at 17-19.) In its pa-

pers, Dade argued, however, that a genuine dispute of fact existed with regard to damages under the Account Purchase Agreement because Dade had already paid $500,000 to ASFG pursuant to that agreement, and should therefore be entitled to an offset. (Opp'n, ECF No. 35, at 19.) ASFG does not contend that Dade did not actually pay that amount, and in fact tallies precisely $501,722.85 in payments made by Dade under the Account Purchase Agreement. (Rep., ECF No. 36, at 9-10.) Instead, ASFG says its damages figure already accounts for those payments, so that those numbers have already been subtracted from what would otherwise be a larger number. (*Id.*) Dade conceded that point at the hearing on this Motion.

### III. ASFG's Most Recent Damages Figures

In its most recent submission, ASFG provides a table detailing its damages. In the table, ASFG accounts for $4,270,682.58 owed by Dade under the TLPA and $459,461.13 owed under the Account Purchase Agreement, for a subtotal of $4,730,143.71. (Rep. Ex. M, ECF No. 36-3, at 6.) ASFG then adds $234,326.36 for accrued interest, and subtracts $433,982.32 as mitigation from collections. (*Id.*) ASFG then adds $73,137.39 for "Legal Fees & Costs"[5] and $4,914.77 for "Servicing Costs—Damage Mitigation." (*Id.*)

All of that adds up to total damages allegedly owed under the two contracts of $4,608,539.91 as of September 15, 2015. (*Id.*)

### LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), a party may move for sum-

---

5. In its Opposition, Dade does not argue that legal fees should not be included in the dam-

age calculation. (*See* Opp'n, ECF No. 35).

mary judgment as to a claim or part of each claim. Summary judgment is appropriate on an element of a claim where the Court is satisfied that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Material facts are those that may affect the outcome of the case. *Anderson . v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When the Court weighs the evidence to be presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505.

 The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The moving party may meet this burden by identifying the "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' " that show an absence of dispute regarding a material fact. *Id.* When a Plaintiff seeks summary judgment as to an element for which it bears the burden of proof, "it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir.2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir.1992)).

 Once the moving party satisfies this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine dispute for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus.· Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, to survive summary judgment, the nonmoving party must "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts' " that would allow a reasonable fact finder to return a verdict for the non-moving party. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Further, the non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. The nonmoving party must identify those facts of record that would contradict the facts identified by the movant.

## ANALYSIS

### I. Breach of Contract Elements

 The parties agree that California contract law controls in this case. Under California contract law, to establish breach, the plaintiff must prove (1) that a contracts exists, (2) the plaintiff's performance or excuse for nonperformance, (3) the defendant's breach, and (4) that the plaintiff suffered damages. *Reichert v. General Ins. Co.*, 68 Cal.2d 822, 830, 69 Cal.Rptr. 321, 442 P.2d 377 (1968); *Wall Street Network, Ltd. v. New York Times Co.*, 164 Cal.App.4th 1171, 1178, 80 Cal.Rptr.3d 6 (2008); *Nationwide Mut. Ins. Co. v. Ryan*, 36 F.Supp.3d 930, 938 (N.D.Cal.2014).

### II. Tuition Loan Program Agreement

ASFG seeks summary judgment in its favor for its first cause of action, that Dade breached the TLPA. ASFG met its initial burden by identifying record evidence sup-

porting the existence and validity of the TLPA contract, which Dade does not challenge. Likewise, ASFG shows and Dade admits that Dade did not adhere to the terms of the TLPA. Thus, ASFG has established the first and third elements of breach of contract.

Dade argues, however, that a genuine dispute of material fact exists with regard to whether Dade performed in good faith, calling into question the element of plaintiff's performance, and that Dade cannot adequately prove its damages, challenging the fourth element. These two elements are discussed in turn.

### A. *Plaintiff's Performance*

 Every contract contains an implied covenant of good faith and fair dealing. *Cates Constr., Inc. v. Talbot Partners*, 21 Cal.4th 28, 43, 86 Cal.Rptr.2d 855, 980 P.2d 407 (1999). Performance in good faith requires the parties to be "faithful[ ] to an agreed common purpose" and to perform "consistent[ly] with the justified expectations of the other party." *Neal v. Farmers Ins. Exch.*, 21 Cal.3d 910, 922 n. 5, 148 Cal.Rptr. 389, 582 P.2d 980 (1978). California courts determine what conduct meets those criteria on a "case by case basis" depending on the "contractual purposes and reasonably justified expectations of the parties." *Id.*

 Relatedly, acts that comply with the terms of a contract "cannot without more be equated with bad faith." *Balfour, Guthrie & Co., Ltd. v. Gourmet Farms*, 108 Cal.App.3d 181, 191, 166 Cal. Rptr. 422 (1980). In other words, where a contract leaves the manner of performance to the discretion of one of the parties, a party cannot support a breach of contract claim based on bad faith. *See Eichman v. Fotomat Corp.*, 880 F.2d 149, 163–64 (9th Cir.1989) (finding no breach by franchisor where franchise agreement did not explic-

itly grant franchisee exclusivity in a territory); 14A Cal. Jur. 3d Contracts § 372 ("A breach does not occur when the party refusing to perform fails or refuses to perform tasks that he or she is not obligated to perform either by law or by the terms of the contract.").

Dade does not cite, nor has this Court discovered, a case applying California contract law in which a defendant successfully asserts bad faith to show that the plaintiff did not actually perform, thereby defeating a breach of contract claim. Instead, breach of the implied covenant of good faith and fair dealing comes up repeatedly in insurance and employment cases as its own cause of action. *See, e.g., Molecular Analytical Sys. v. Ciphergen Biosystems, Inc.*, 186 Cal.App.4th 696, 712, 111 Cal.Rptr.3d 876 (2010) (plaintiff sued defendant for breach of implied covenant of good faith); *Howard v. Am. Nat. Fire Ins. Co.*, 187 Cal.App.4th 498, 528, 115 Cal.Rptr.3d 42 (2010), as modified on denial of reh'g (Sept. 9, 2010) ("Breach of the covenant of good faith and fair dealing exposes an insurer to breach of contract and tort damages."); *Habitat Trust for Wildlife, Inc. v. City of Rancho Cucamonga*, 175 Cal.App.4th 1306, 1344, 96 Cal.Rptr.3d 813 (2009) ("Breach of the covenant of good faith and fair dealing is nothing more than a cause of action for breach of contract."); *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal.App.3d 1371, 1395, 272 Cal.Rptr. 387 (1990) (discussing the tort and noting that "whether such a concept has any application in non-insurance cases appears to be increasingly problematic").

There is no bad faith cause of action at issue in ASFG's Motion for Summary Judgment. It is, therefore, unclear whether Dade may assert bad faith to create a dispute as to whether ASFG performed. Even if this is possible—assuming without deciding that bad faith performance is

equivalent to not fully performing one's contractual obligations—Dade still has not adequately identified evidence giving rise to a genuine dispute on this point.

Notably, Dade cannot point to any term in the TLPA that would require ASFG to service the loans any differently than it did. If Dade were allowed to use this argument to defeat summary judgment, any defendant sued for breach of contract could raise its own subjective expectations to say that the plaintiff's performance did not comply and therefore was in bad faith. If that were enough to create a triable issue of whether the plaintiff performed, summary judgment would be nearly impossible in contract cases.

█ Thus, Dade's specific allegation that ASFG may have been trying to precipitate default by not allowing the student borrowers greater flexibility—flexibility that was not contractually required—is not enough to create a genuine dispute as to whether ASFG performed its end of the bargain. Allowing loan "workouts" is a particular way of performing collections. If it was important to Dade that its students be allowed workouts, it should have included a term to that effect in the contract.

To lend evidence to the idea that there is a dispute of fact on this point, Dade relies on the declaration of its Chief Executive Officer Chris Gressett, in which Gressett says he expected ASFG and its servicer to take "all reasonable efforts to work with borrowers to avoid defaults and to mitigate damages if borrowers became delinquent on their loans." (Gressett Decl., ECF No. 35-2, at 3.) There is no reason to doubt that Gressett sincerely expected these reasonable efforts, and even more particularly, that he expected ASFG to offer Dade students workouts. But the parties' rights and obligations are governed by the contract, not the subjective expectations of the individuals on each side

of the bargain. Therefore, as a matter of law, failure to take particular steps that are not required by the TLPA does not give rise to a genuine dispute of fact over whether ASFG performed.

Next, Dade argues the allocation of risk in the TLPA supports the notion that the parties understood loan workouts and accommodations to be part of the bargain: "[p]roper servicing was important to Dade because ... Dade could be required to purchase non-performing loans," and "ASFG really had no exposure for loans going into default." (Opp'n, ECF 35, at 14.) At the time of contracting, ASFG likely stood to gain by actually collecting on loans, so the parties probably saw their interests as aligned on this point. That does not mean, however, that the parties did not think about who would bear the risk of default—they did—it is simply that, now that default occurred on a fairly large scale, Dade has realized the significance of agreeing to that term and bearing that risk. In hindsight, this may have, in fact, been a bad deal for Dade. But again, there simply is no term requiring ASFG to provide workouts for borrowers, so failure to take those steps, even if these failures resulted in some borrowers defaulting who may not have, does not amount to bad faith.

Finally, Dade points to ASFG's agreement with its servicer, UAS, arguing that ASFG's instruction to UAS in February 2015 to stop due diligence calls supports an inference that Dade was trying to encourage default or rack up fees. However, ASFG had declared a Program Default months before this instruction was given, so the timing of the instruction does not support an inference that ASFG was trying to raise the default rate. Dade suggested at oral argument that this information could also support an inference that there is other evidence that has not yet been

discovered that may tend to prove bad faith. But that possibility is too attenuated to create a genuine dispute of material fact.

In sum, the Court concludes that Dade has not identified anything in the record sufficient to rebut ASFG's evidence that it did in fact perform its end of the contract. There is, therefore, no genuine dispute of material fact that ASFG performed its obligations under the TLPA.

## B. *Damages to the Plaintiff*

█ Next, Dade argues that there is a dispute about the amount of damages. Put simply, Dade says the value of the Cottingham Note should offset the damages owed. ASFG, to some extent, agrees. ASFG clarifies, however, that the Cottingham Note has not been sold, so at this point the value of the note does not reduce the amount of damages owed. Instead, the proceeds from the Cottingham Note, once sold at a UCC sale, would serve to reduce the total damages owed. Likewise, interest payments from the Cottingham Note fund count as payment toward the damages figure.

When the parties made this deal, ASFG could not be sure that Dade would have sufficient liquid assets to pay a judgment ASFG might seek, thus, ASFG asked for security. In this way, the Cottingham Note will serve the stated "purpose of providing security for the full satisfaction and performance of all '[Dade's] Obligations.'"[6]

The Cottingham Note is relevant to ASFG's damages, but not to the extent that Dade argues. Because ASFG has directed that interest payments be paid to itself rather than Dade, interest payments received pursuant to the Cottingham Note reduce the amount Dade owes ASFG. Likewise, if ASFG sells the Cottingham Note, the value received will count as a credit toward the amount owed to ASFG.[7]

Thus, Dade has not identified anything in the record to call into doubt ASFG's evidence that it is entitled to damages under the TLPA. There is, therefore, no genuine dispute of material fact with regard to ASFG's entitlement to damages under the TLPA.

## IV. Account Purchase Agreement

Under the Account Purchase Agreement, as in the TLPA, ASFG provides evidence that it has satisfied all four breach of contract elements, and Dade argues there are disputes of fact with regard to Dade's performance and damages.

## A. *Plaintiff's Performance*

█ Dade argues that ASFG did not perform its obligations under the Account Purchase Agreement because its performance was in bad faith. To support this argument, Dade cites ASFG's instructions to its loan servicer UAS, certain provisions in the Account Purchase Agreement relat-

6. Dade argued in its Opposition that this language might mean the sale of the note would extinguish all of Dade's obligations under the TLPA, as though the value of the note served as a sort of floating liquidated damages clause. The language of the TLPA does not support such a reading, which Dade more or less conceded at the hearing on this Motion, but instead suggests that the existence of the Cottingham Note ensures that ASFG would be able to recover something, for example, if Dade were insolvent. If the parties meant for the Cottingham Note to, like a liquidated

damages clause, extinguish any other liability by Dade under the TLPA, they probably would have said so explicitly in the contract.

7. At oral argument, Dade was concerned that ASFG may seek a windfall by collecting all of the damages owed under the contract in addition to the proceeds from the Cottingham Note. Of course, ASFG is entitled only to its contract damages. Excess proceeds, if any, from the Note would belong to Dade.

ed to servicing, and the requirement that Dade pay ASFG $375 for each defaulted loan to "defray the costs to be incurred by [ASFG] for enhanced servicing and default avoidance services." (Opp'n, ECF No. 35, at 14.)

ASFG states in its Separate Statement of Undisputed Facts, "ASFG has performed all covenants, conditions and promises required to be performed by it under the terms of the Account Purchase Agreement, except to the extent excused." (ECF No. 31-2, at 15.) In its reply to those facts, Dade simply states, "Undisputed." (Def. UMF, No. 64, ECF No. 35-3, at 22-23.) On the other hand, citing sections 6.1.1 through 6.1.4 of the Account Purchase Agreement, Dade does dispute ASFG's contention that there are no covenants regarding how the accounts will be serviced. (Def. UMF, No. 71, ECF No. 35-3, at 24.) Dade stops short of explaining exactly how ASFG deviated from the servicing parameters provided in section 6, however.

A close reading of the sections Dade cites—sections 6.1.1 through 6.1.4—reveals only that JLB, ASFG's predecessor in this contract, as the purchaser of the loans from Dade, would take over servicing loans. (Account Purchase Agreement, §§ 6.1.1-6.1.4; ECF No. 31-10, at 8.) As was the case in the TLPA, the Account Purchase Agreement does not actually say what particular collection efforts JLB, and later ASFG, must make in collecting on loans. (Id.)

As with the TLPA, the instruction to UAS after the institutional default does not support an inference of bad faith.

Dade admits that ASFG performed appropriately, and although Dade raises a point about payments to defray collection efforts, Dade does not point to anything specific in the record, even after citing section 6 of the agreement, to suggest that ASFG did not perform as required. There

is, therefore, no genuine dispute of material fact regarding ASFG's performance of the Account Purchase Agreement.

## B. *Damages to the Plaintiff*

Finally, as with the TLPA, under the Account Purchase Agreement, there is not a dispute about whether ASFG is entitled to damages, but there is some confusion about the amount for which Dade is liable. To the extent that Dade has paid certain amounts owed under the Account Purchase Agreement, it would not be liable for those compensatory damages. Both parties, in their own ways, seem to agree on that point. ASFG acknowledges that Dade paid approximately $500,000, and simply states that amount is accounted for, and the figure it presents is, therefore, $500,000 less than it would have been if Dade had not paid. Dade acknowledged at the hearing on this Motion that ASFG's papers account for this payment.

Because Dade has not pointed to specific record evidence to rebut ASFG's evidence regarding the amount owed under the Account Purchase Agreement, there is no genuine dispute of material fact with regard to the damages element of ASFG's breach of contract claim.

## CONCLUSION

ASFG has met its initial burden of identifying record evidence sufficient to satisfy all four elements of its breach of contract claims for its first and second causes of action. Although Dade challenges the sufficiency of ASFG's performance and the particulars of its damages claims, Dade has not identified any record evidence adequate to raise a genuine dispute of fact on those elements in either cause of action. The Court therefore **GRANTS** ASFG's Motion for Summary Judgment With Re-

gard to the First and Second Causes of Action.

Based on its filing, which was current as of September 15, 2015, ASFG is entitled to damages of $4,270,682.58 for Dade's breach of the TLPA, $459,461.13 for Dade's breach of the Account Purchase Agreement, $73,137.39 in attorneys' fees and costs, $4,914.77 for servicing costs, and $234,326.36 for accrued interest, less any mitigation from collections on loans—including the $433,982.32 collected as of September 15, 2015—and, with regard to the TLPA damages, less any interest payments or proceeds from the Cottingham Note. Likewise, any additional collections received or payments made under either agreement reduce the amount Dade owes ASFG.

IT IS SO ORDERED.